### ATLANTIC COAST LIFE INS. CO. v. UNITED STATES.

No. 1712.

District Court, E. D. South Carolina, at Charleston.

Jan. 16, 1948.

Hagood, Rivers & Young, of Charleston, S. C., for plaintiff.

Ben Scott Whaley, U. S. Atty. and Louis M. Shimel, Asst. U. S. Atty., both of Charleston, S. C., for defendant.

Atlantic Coast Life Insurance Company, a corporation engaged in industrial insurance, having paid taxes imposed under the Social Security Act, 26 U.S.C.A. Int.Rev. Code, §§ 1400–1432, brought this action (under the Tucker Act, 28 U.S.C.A. § 41 (20) to recover the sum of $2,933.30 alleged to have been erroneously assessed for the last three quarters of the year 1945 (April 1 to December 31, 1945). The assessment had been determined by the Commissioner of Internal Revenue, based upon his view that the compensation received by certain agents of the company was taxable in that these agents were employees of the plaintiff company. The company takes the position that such agents were not employees and, as their compensation was wholly and entirely made up of commissions upon the business produced by them, it is claimed that they were really independent contractors and their compensation was not subject to the tax under the act.

WARING, District Judge.

Opinion

The most recent controlling decision of the Supreme Court expounding and explaining the proper application of taxes under the social security act is in the case of United States v. Silk, 331 U.S. 704, 67 S.Ct. 1463. In that case, together with a companion case (Harrison v. Greyvan Lines, Inc.,) passed upon in the same opinion, the Court gives a full and complete discussion of the impact of the social security act upon the relationship of employer and employee and the opinion sheds considerable new light upon the proper approach to and consideration of this act and its effect.

The parties have cited and strongly rely upon certain cases decided before the recent decision in United States v. Silk, supra. In view of that decision, most of the cited cases are of little help but reference to a few of those more strongly stressed may be advisable.

The plaintiff argues at length that this case is similar to and should be governed by Magruder v. Yellow Cab Co., 141 F.2d 324, 152 A.L.R. 516, decided in 1944 by the Circuit Court of Appeals for the Fourth Circuit. There it was held that taxi cab drivers were not employees. But an examination of the facts in that case, as set forth in the court's opinion (and more fully set forth in the opinion of the District Court, 49 F.Supp. 605) shows a very different situation from the one at bar. There the taxi cab drivers paid rental for the cabs furnished by the company and retained all fares collected. While of course the company had a general control over the method of operation of their cabs, it is quite clear that the drivers did not get any wages or remuneration from the company and they were independent contractors operating a business of their own. A case involving practically the same facts was decided in similar fashion by the United States Court of Appeals for the District of Columbia, United States v. Davis, 154 F.2d 314.

In Johnson v. Altmeyer, 63 F.Supp. 796, the District Court for the Western District of Kentucky held that a life insurance agent who operated entirely on a commission basis was an employee. Whereas, in the more recent case of Gause-Ware Service Insurance Company v. Thomas, 76 F. Supp. 626, the District Court for the Northern District of Texas decided that

an agent for an industrial insurance company was not an employee. The District Court did not write an opinion but merely filed conclusions without giving any reasons therefor. It appears that the case was appealed to the Circuit Court of Appeals for the Fifth Circuit but was there dismissed on motion of the appellant without opinion; so that we do not know whether some settlement was arrived at or what the views of the court might have been. See Thomas, Community Survivor, v. Gause-Ware Service Insurance Company, 5 Cir., 159 F.2d 1018.

Many other cases which may be persuasive have been called to my attention and particularly a very large number of various state decisions. These latter have not been of great help because of the reason that they almost invariably are governed by the particular form of the statute involved.

The South Carolina case of Carter's Dependents v. Palmetto State Life Insurance Co., 209 S.C. 67, 38 S.E.2d 905, is cited as showing the views of the Supreme Court of the State of South Carolina as to the status of an industrial insurance agent under the South Carolina Workmen's Compensation Act. But that case is not in any way controlling in a discussion of the status of an agent under the Federal Social Security Act and is decided entirely within the purview of the State Compensation Act, 39 S.C. Statutes at Large, page 1231 et seq., and the test announced by the court is wholly that of control of the employee. The court there decides that the question of whether the employer has the right of control is to be determined from the contract and holds that the contracts with the agents did not give the requisite control. But the decision is not at all in accord, and is in fact in conflict, with the reasoning of the Supreme Court of the United States in the Silk case, supra.

Among many other cases cited by the plaintiff is that of Schwing v. United States, 65 F.Supp. 227, where the District Court for the Eastern District of Pennsylvania held that certain tailors employed in making garments were independent contractors rather than employees under the social security laws. The court held that it did not appear that the employers (plaintiffs) had "such control over how the tailors were to produce the desired product * * * as to lead to the conclusion that these journeyman tailors were plaintiffs' employees." (Page 230 of 65 F.Supp.). It will thus be seen that the element of control was the deciding factor in that case in the District Court. However, this case went to the Circuit Court of Appeals for the Third Circuit and on January 7, 1948, that court handed down a decision reversing the District Court. 165 F.2d 518. The opinion is extremely interesting, mainly from the standpoint that it approaches the question from a new viewpoint as a result of the case of United States v. Silk, supra. I have been furnished with a copy of the opinion of the Circuit Court of Appeals which has not yet appeared in the official reports. The court says: "In determining whether the individual tailors were employees or not under these facts, it is clear that the District Court in both cases applied the restricted common law definition of 'employee', under which the findings that the taxpayers did not control the details and means by which a satisfactory garment was to be produced and the taxpayers did not supply equipment and a place to work were crucial. However, in the companion decisions of United States v. Silk and Harrison v. Greyvan Lines, Inc., 331 U.S. 704, 67 S.Ct. 1463, 1468, the Supreme Court has recently indicated that the technical common law concepts are not necessarily controlling in cases of this sort and that 'the primary consideration in the determination of the applicability of the statutory definition is whether effectuation of the declared policy and purposes of the Act comprehend securing to the individual the rights guaranteed and protection afforded by the Act.' See United States v. Silk, supra, 331 U.S. 704, at page 713, 67 S.Ct. 1463, at page 1468."

While the facts in regard to the employment of tailors have many differences from the case at bar, nevertheless, the reasoning of the court and the adoption of the new point of view brought about by the Silk case decision is significant and very persuasive.

■ And so I am of the opinion that this matter must be considered by me as a case of novel impression, due to be considered in the broad light shed by the opinion in the Silk case. The older decisions are in great part based upon the degree of control the employer had over the employee, but this is only one of the items to be considered. As the court says in the Silk case (page 716 of 331 U.S., page 1469 of 67 S. Ct.) : "Probably it is quite impossible to extract from the statute a rule of thumb to define the limits of the employer-employee relationship. The Social Security Agency and the courts will find that degrees of control, opportunities for profit or loss, investment in facilities, permanency of relation and skill required in the claimed independent operation are important for decision. No one is controlling nor is the list complete."

■ From the foregoing it will be seen that there are at least five different elements which must be given consideration. The degree of control is certainly one of great importance though not exclusive. In the case at bar the plaintiff stresses the fact that these agents were given a free rein and there was little degree of control. But that is only partially true. Certainly the agents were free to exercise their own individual time, methods and ingenuity in collections and obtaining new business. However, the company in some ways exercised a very rigid control. The debits were strictly limited by the company and were subject to the absolute control of the company. The debit could be enlarged or diminished at any time and could be taken away entirely if the company saw fit. The agents, while not told in detail how to collect, certainly had to make adequate collections and make satisfactory reports or they would no longer work for the company. I do not think that degree of control means that the employer has to stand over the employee and direct every move that he makes. And because an employee is given an opportunity to exercise his own faculties in the business of the employer does not take away the fact that he is an employee or make him an independent contractor.

Following out the five elements above referred to, the second, as set out in the Silk case, is opportunity for profit or loss. In this case it is true that the agent was in great part dependent upon his own energy and ability as to whether he made money or not, but this opportunity was strictly within the control of the employer since the debit was controlled by it.

Referring to the third element, there was no investment in facilities by the agent. All supplies and facilities were furnished by the company save only the matter of transportation if and where necessary.

The fourth element, namely, permanency of relation, was present in that, while neither party was bound to continue permanently with the other, nevertheless it was quite apparent from the testimony that the company expected to make long-time, if not permanent, relations with its agents, and many of the agents testified to having been with the company during most of its life. Of course both parties had the right of cancellation but the relation was not calculated to be a temporary relation to be entered into for a stated period or for a class of work which would naturally end within some period of time. The idea of both company and agent seems to have been that they would remain together so long as it was profitable and agreeable.

The fifth element, namely, skill required in the operation, is strongly stressed by the company and it is claimed that the agent's skill controls the whole situation. While that is in great part true, it can be equally claimed to be true in any employment relationship. If the various controlled employees do not have sufficient skill, the employer of course discharges them. In this case, the agents were expected to have skill in salesmanship and in the proper approach to those insured and to prospects for insurance. But after all, the company outlined the general method of handling these matters and in fact had assistant managers to instruct the new employees (and they were admitted to be employees until instructed) and even after they acquired the status of agents, these men were given instructions, talks, had meetings and dem-

onstrations. While it is true that the agents were not required to attend the meetings and gatherings and report to the office regularly, nevertheless, most of them did so. They testified that it was to their benefit to do this since it aided their business and earnings and it was also of benefit to the company to keep up and maintain this service. But looking at the matter realistically, it is quite apparent that the agents were expected to, and as a matter of fact did, attend most of these hearings and to adopt and follow the suggestions made by the company's instructors and officers.

And while the compensation of the agent has no limit, such as a salary or wage, nevertheless, the company distinctly has the right to limit the amount that can be made by its absolute and complete control of the debit. And so the company really controls and directs, through the allocation of the debit, the measure of compensation received by the agent. The more efficient and experienced agents naturally make more money and this is brought about by the fact that they do better work and the company gives them sufficiently attractive fields in which to exercise their talents. This is not far from actually fixing wages or salaries and it can be readily imagined that if an agent begins to fall off in his skill and operations, the company will inquire as to whether it is the fault of the agent or whether he needs an enlargement or betterment in his debit situation and whether he shall remain in the employ of the company.

It is true that the contract of employment is written from the standpoint of an independent agency, but after all, the mere language of the contract is not what controls, but it is what is the actual relationship between the parties. "Contracts, however 'skilfully devised,' Lucas v. Earl, 281 U.S. 111, 115, 50 S.Ct. 241, 74 L.Ed. 731, should not be permitted to shift tax liability as definitely fixed by the statutes." United States v. Silk, supra, 331 U.S. at page 715, 67 S.Ct. at page 1469.

And so I have concluded that these agents are employees within the contemplation of the social security act.

## Findings of Fact.

1. The plaintiff Atlantic Coast Life Insurance Company is a corporation organized and doing business under the laws of the State of South Carolina. It was incorporated in 1925 and its charter shows that the general nature of its business is "a life, health, and accident insurance company on the industrial plan." The company's head office and principal place of business is in the City of Charleston and it has other offices in Columbia, Beaufort, Orangeburg, Florence, Hartsville, Greenville and Georgetown, all in the State of South Carolina. Its business has been and is now conducted upon the same general plan with very little change since its incorporation; except it has materially increased its business and extended its field of operations. The company has had large success and its business appears to be growing and profitable.

2. In the year 1945 (this case relates to three quarterly periods of that year), in addition to its officers and clerical force at its home office, the company had in its employ eight managers, twenty-six assistant managers, and one sales instructor, all of whom are admitted to be employees and their status is not considered in this case.

3. In addition there were approximately one hundred sixty-three persons who were "agents" engaged in soliciting and selling life insurance, collecting premiums and carrying on other activities for and on behalf of the company, and the issue in this cause is as to whether the status of such agents was that of employees or independent contractors.

4. It appears that in 1938 the Deputy Commissioner of Internal Revenue ruled that the company's managers and agents were employees. In March 1939 the same official ruled that taxpayer's agents were not employees. On July 3, 1945, the Commissioner of Internal Revenue again considered the matter and ruled that the agents were employees for the purposes of the tax imposed by the Federal Insurance Contributions Act (Social Security) Title 26 U.S.C.A. Int.Rev.Code, §§ 1400–1432, but held they were exempt from liability for the tax imposed by the Federal Unem-

ployment Tax Act 26 U.S.C.A. Int.Rev. Code, § 1600 et seq. (this last matter is not involved in this suit).

5. The company made its returns in accordance with the ruling of the Commissioner and paid the taxes assessed and filed claims for refund. The Commissioner disallowed the claim for refund of the tax under the Federal Insurance Contributions Act and thereafter this suit was brought for the amount alleged to have been erroneously assessed for the last three quarters of 1945 for the amount paid in that period, totalling $2,933.30.

6. The company wrote life, health and accident insurance on both white and colored persons in the State of South Carolina; about 75% of the insurance being written on colored persons. It received applications and issued policies of insurance. The premiums charged were in accordance with rates fixed by the company and applications were accepted for insurance subject to its approval. The company limited its insurance policies according to the age and color or race of the applicant and its maximum life insurance on a white person was $1,000 and $500 on a colored person. The premiums were payable weekly and of course varied according to the age and color of the applicants. Most of the premiums were very small, amounting in many instances to only a few cents per week. While occasionally premiums were paid at the office of the company, practically all of them were collected by the agents; and one of the principal duties of the agents was to visit the various policy holders and collect each week. The agent made weekly remittances to the company, rendered an accounting on forms and in the manner prescribed by the company, deducting his commissions and paying in the balance collected. It appears that each agent was allotted a territory or area which was commonly known as a "debit." In rural sections these "debits" might consist of a considerable area, measured in square miles or according to certain convenient boundaries. In cities or towns a debit usually consisted of several blocks or some conveniently situated area. A debit would be turned over to an agent and he would collect or endeavor to collect all premiums due by policy holders in the debit area each week and at the same time endeavor to obtain new applications and sell insurance to new parties. In the weekly report of the agent, he would account for his collections, list new business, lapsed business, and reinstated business, and would deduct his commissions and turn in the balance. Customarily Friday of each week was the day on which settlement was made and the agents generally appeared at the company's office and made settlement with the cashier, although those living in the country often reported and did business by mail.

7. The customary commissions were 20% of the premiums collected from current policy holders. This percentage was somewhat higher sometimes, as much as 23%, in the case of agents with rural debits, this being done primarily because the rural debit areas were more scattered and required more time to cover and the use of an automobile or other means of transportation was necessary. In addition to the percentage above set out, on every new policy written by an agent the company credited 20 times the amount of its weekly premium to the agent's "reserve account." And the agent was entitled to draw 10% of this credit in addition to his percentage on collections, provided he had averaged at least 92% of his collections over the preceding four weeks. There were certain provisions in regard to the company's allowing or withholding the right to withdraw upon the reserve if the above standard was not met but they are minor details which it is immaterial to go into here.

8. A person desiring to become an agent signed and filed an application. (See Exhibits 4 and 5) Exhibit 4 is the form of application that had been in effect for a number of years but was abandoned in 1939, and since that time the form shown in Exhibit 5 was used. This is the form of application that was in effect at the time covered by this suit. If the applicant was accepted by the company and he had not had sufficient experience in work of this kind, he was given an appointment as "special agent," was paid a salary and accompanied on his rounds in one of the debits by an assistant manager and given

instructions as to the method of work. During that period, it is admitted, he was considered an employee and no question is made as to the status of any such special agent. When such applicant was thought to be sufficiently proficient, he was given an appointment as agent and made application to the South Carolina Insurance Department and obtained a license as a life insurance agent. He would then be assigned a debit, furnished with the necessary forms, blanks, reports, rate books, and other information. The company of course fixed the rates and method of doing business and the agent was assigned to a particular debit and was not supposed to do business outside of that area. The company had a right to change the debit, add to it, subdivide it, or subtract from it. Agents sometimes exchanged parts of their debits or turned over to each other individuals who had moved their residences, but all these matters were subject to the final approval of the company.

9. The company had the right and privilege to terminate the contractual relations at any time and the agent had like power, and upon such being done, by either, a settlement was had between the company and the agent as to all funds due by the one to the other, but the agent had no further right or share in any business in his former debit or any business written by him.

10. Upon the appointment of an applicant as agent, a contract was entered into (see Exhibit 3) by which the agent agreed to solicit for insurance, to deliver policies, to accept premiums, to secure applications for reinstatement and use his best efforts to keep business on the books of the company, and he further agreed that the business would be carried on according to the ethics of the life insurance profession and the laws of South Carolina; and to conduct himself so as not to adversely affect the company. The agent was free to arrange his own time and methods but the company had the right to prescribe rules governing its practices, and the agent had no power to alter or change any contract or rule of the company. The agent agreed to pay all of his expenses and he could not incur any indebtedness for the company and he further agreed to keep all records as required which would be at all times subject to inspection and to surrender them to the company upon termination of the agreement. It was agreed that the company did not place upon the agent "any requirements as to the results to be accomplished," and the agent was compensated by commissions as set forth. The manner of payment of commissions was set forth substantially as above recited, together with much additional detail. The right is reserved to terminate the agreement by either party. Printed on the back of this contract is an affidavit to be signed by the agent, which is as follows:

"State of South Carolina
County of —————

Personally appeared before me ————— who being duly sworn says that he is an Independent Commission Agent of the Atlantic Coast Life Insurance Company of Charleston, South Carolina, and that he is an Agent under the within written Agreement. That he acts as an independent agent in accordance with the within written agreement, which is the whole agreement between the parties, and that there are no other rules and regulations of the Company except the within written agreement.

That he regards his profession as an insurance man as an independent profession and recognized as such by the State Insurance Department of the State of South Carolina, since his compensation is not controlled by the Company but depends entirely upon his own efforts and ability to produce results being strictly on a commission basis. Deponent further states that he does not consider himself covered by the Social Security Act.

Sworn To and Subscribed
Before Me this ——— day
of ————— 194— —————

Notary Public, S. C.
My Commission expires at the pleasure of the Governor."

11. The assistant managers have a certain amount of control and supervision of

the work of the agents. The former are paid salaries and in addition receive a certain commission upon business written, but their status is not involved in this suit. The assistant managers from time to time visit the debits and inspect the method of doing business by the agents, sometimes accompanying them on rounds so as to check up on insurance written and premiums collected. But as a practical matter they do not take much part in the work of an agent who knows his business or has been with the company a considerable time and is doing satisfactory work. As shown by the contract, the agent is free to fix his own time for collections and performance of other duties. It is stated that he does not have to attend to the payment of benefits accruing from death or sickness, but that he generally does so as a matter of good business for both himself and the company; and he performs many little services in connection with the outstanding policies since all of these build up good will for the company and increase his business. The agents often gather at the head office and it is in testimony that a large number of them would usually meet at the Charleston office early each morning but this was not required. Desks are furnished at the head office, each one with the name of the agent on it for convenience in making up reports and for such other business that may be done by him. But there is no requirement that the agent must use this, the same being optional, and if he chooses he may make up his report elsewhere. A sales instructor is employed to assist in increasing the business, giving talks to the agents, making suggestions as to new or improved methods. The company frequently has meetings of its agents and although they are not required to attend they are urged so to do and they state that they find it beneficial and interesting.

12. Several agents testified that their work in connection with the company was quite satisfactory and their commissions amounted to anywhere from $5,000 to $10,000 per year. Several of the older or more experienced agents often make more than $10,000 per annum. Their testimony was that very few of them worked each day in the week and usually their work was through on the third or fourth day of the week, the other days being given over to pleasure, recreation, or any side lines that they wished to take up. Only a few of the agents, however, were put up as witnesses. Attached to the complaint (Exhibit D) is a schedule setting forth the basis of the claim for refund in this suit. That schedule shows commissions earned over three quarters of the year 1945 but does not give the totals for the year or those in excess of $3,000. By an examination of this schedule it will be noted that while there are a number that go as high as $1,000 per quarter or more, these are a rather small minority and the larger number of the agents did not make anything approaching the aforesaid figures.

13. An agent did not advertise or have any office or identity of his own, but the company did advertise, offered premiums, had contests for and kept ratings of its agents, all of which inured to the benefit of both the company and the agents. Some agents would at times write some other insurance for a non-competitive company but this did not happen often. The agents represented themselves as agents of the company and did not hold themselves out to be independent or run independent offices; and the license from the State was to sell insurance and collect premiums only for this company. Agents in cities usually had a compact debit area and covered the territory on foot, but if they had to use automobiles, buses or other forms of transportation, they paid for it themselves. In rural areas, agents had to use automobiles and the cost of same was paid by them.

### Conclusions of Law

1. The agents of Atlantic Coast Life Insurance Company are employees of the employer, said Life Insurance Company, under the terms of the Social Security Act, Title 26 U.S.C.A. Int.Rev.Code, §§ 1400–1432, and as such, the company is subject to the assessments for tax contributions under that act, as determined by the Commissioner of Internal Revenue.

2. The plaintiff, Atlantic Coast Life Insurance Company, is not entitled to a re-

fund of the amount of taxes paid and sued for in this case, to wit, the sum of $2,933.-30, and judgment must be entered for the defendant.

An order will be filed in accordance with the foregoing findings and conclusions.