J. G. ELLISON, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1900–68.   Filed October 27, 1970.

*J. Larry Broyles* and *James E. Johnson, Jr.,* for the petitioner.
*Charles B. Sklar* and *David S. Meisel,* for the respondent.

SIMPSON, *Judge:* The respondent determined deficiencies in the income tax of the petitioner in the amounts of $877.18 for 1963 and

---

$2,247.95 for 1964. The issue for decision is whether the petitioner was an employee of the Investment Life & Trust Co. on August 27, 1957, and continued in that relationship through August 1964, or whether he dealt with the company as an independent contractor during that period. The answer will determine whether or not a stock option exercised by the petitioner in 1963 and 1964 was a restricted stock option as defined by section 424,[1] Internal Revenue Code of 1954.[2]

FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioner is an individual who resided in Martinez, Ga., when the petition was filed in this case. For the taxable years 1963 and 1964, he filed his Federal income tax returns, using the cash method of accounting, with the district director of internal revenue, Columbia, S.C. During those years, he resided in Calhoun Falls, S.C.

The Investment Life & Trust Co. (ILT), a life insurance company which had its home office in Mullins, S.C., was organized in 1956. Since its organization, and at all times relevant hereto, the president of ILT has been J. B. "Bunk" Stackhouse.

In 1957, Mr. Stackhouse went to Calhoun Falls, S.C., to interest the petitioner in becoming a general agent for ILT. The petitioner had no preparation by way of education or experience for the job of selling life insurance, and he told Mr. Stackhouse that he knew nothing about such work. Mr. Stackhouse replied that he preferred a man who knew nothing about the job so that ILT could train him to sell insurance in the manner which it preferred. To induce the petitioner to take the position, Mr. Stackhouse told him that he could expect high income from commissions earned by selling the insurance, and that he would also reap a large gain by virtue of a stock option which ILT would grant him. Mr. Stackhouse represented that the petitioner would not be taxable on the grant or the exercise of the option—he would not be taxable until the sale of the stock acquired under the option.

On June 25, 1957, a contract entitled "General Agent's Agreement" was executed by the petitioner as "General Agent" and by Mr. Stackhouse on behalf of ILT. The agreement provided that the general agent's duties would be to solicit applications for life insurance with ILT exclusively, to collect the initial premiums for such insurance, and to pay over the premiums to ILT. It set forth a schedule of com-

---

[1] For the taxable year 1963, the section of the Internal Revenue Code dealing with restricted stock options was 421. However, for taxable years ending after Dec. 31, 1963, the rules relating to restricted stock options are contained in sec. 424. Revenue Act of 1964, sec. 221 (78 Stat. 63). No substantive changes were made in the rules applicable in this case, and for convenience, we shall refer only to the provisions of sec. 424.

[2] All statutory references are to the Internal Revenue Code of 1954, unless otherwise indicated.

missions and bonuses which were to constitute the only compensation received by the general agent. It empowered the general agent to appoint subagents, but all contracts made by the general agent with subagents were to be subject to ILT's written approval. Any compensation of the subagent was to be paid out of the commissions and bonuses received by the general agent pursuant to the schedule. It stated that the appointment of the petitioner as general agent was "in and for the following territory: Abbeville County and South Carolina, as directed." The agreement provided that it could not be modified by any oral promises or statements. If the general agent violated his obligations under the agreement at any time, ILT would be able to terminate the agreement at its option. Furthermore, either party could terminate the agreement, apparently at any time, by giving the other party 30 days' notice in writing to that effect. The parties agreed to be bound by the "Rules and Regulations Governing Agents of The Investment Life and Trust Company." The last provision in the agreement said:

23. Nothing contained in this contract shall be construed to create the relationship of employer and employee between the Company and the General Agent, nor between the Company and any Sub-Agent of the General Agent. Within the Territory herein described the General Agent shall be free to exercise his own judgment as to the manner in which he conducts his business, including, by way of illustration but not limitation, hours of work, and other matters pertaining to the operation of his agency.

The petitioner did not bargain with ILT with respect to the terms of this agreement.

The 1957 agreement remained in effect until the execution of a second "General Agent's Agreement" between the petitioner and ILT on January 1, 1964. The petitioner was required to execute this second agreement in order to continue his relationship with ILT. Again, the petitioner did not bargain with ILT with respect to any terms of the agreement. The 1964 agreement was substantially the same as the 1957 agreement, with the following exceptions: the new agreement provided for somewhat lower commissions, made no provision for the appointment of subagents, made clear that the agent's territory was not granted to him exclusively, and stated that the parties agreed to be bound by the provisions of the ILT Field Operating Manual, instead of the "Rules and Regulations Governing Agents of The Investment Life and Trust Company." The new agreement remained in effect until the termination of the relationship between the petitioner and ILT in August 1964.

On August 27, 1957, ILT granted to the petitioner an option to purchase its stock. The option provided for the purchase of a maximum of 5,000 shares of stock at $2 per share, which price was declared

to be at least 95 percent of the then fair market value of the stock. The declared purpose of the company in granting the option was:

to secure and retain general agents and other key employees by making it possible to offer them an incentive * * * to join or continue in the service of the Company * * *

The option was exercisable within 10 years from the date of the grant. The option included provisions for its exercise in the event that "the Agent's employment by the Company" should be terminated because of his death or for any other reason. If the "employment" terminated for a reason other than death, the option had to be exercised within 3 months after the termination date, or 10 years from the date of the grant, whichever occurred earlier. The option was not transferable other than by will or by the laws of descent and distribution; if the agent were alive, only he could exercise the option. Further, it said:

The attention of the Agent is directed to the fact that the Federal Tax benefits provided in Section 421 of the Internal Revenue Code of 1954 as to Restricted Stock Options may be lost if the recipient of such an option disposes of the stock acquired under it within a period of two years following the date of the option grant or within a period of six months following the date of his receipt of the stock.

The petitioner exercised this option by purchasing 2,000 shares of ILT stock at $2 per share on October 28, 1963, and 1,000 shares of ILT stock at $2 per share on October 30, 1964. Such stock had a fair market value of $3.25 per share on October 28, 1963, and of $9.50 per share on October 30, 1964.

The stock option was drafted for ILT by an attorney who subsequently became a professor of law. When the option was granted to the petitioner, Mr. Stackhouse believed and understood that it was a restricted stock option, and he repeatedly represented it as such to the recipients thereof including the petitioner. George W. Smith, the executive vice president of ILT, was granted a stock option identical to that granted to the petitioner, although Mr. Smith was then an administrative officer of the company rather than a general agent.

Joseph J. McMillan was a general agent of ILT from 1960 to 1967, and William F. Evans was a general agent of ILT from 1957 to 1966. Their relationships with ILT were governed by General Agent's Agreements similar to those under which the petitioner operated. Their duties were similar to those of the petitioner. William F. Evans was also granted a stock option identical to that granted to the petitioner.

The petitioner set aside a portion of the mobile home in which he lived for use as his "office." ILT did not pay or reimburse him for any expenses of the mobile home attributable to the office. He also made substantial use of his automobile in his work. The petitioner paid for

his car, and paid all the costs of maintaining it. Also, he paid all of his postage expenses. ILT furnished him with supplies such as stationery, calling cards, "Calls to Clients" books, retail credit forms, application forms, medical examination forms, and forms to effect changes in existing insurance contracts. When the petitioner ceased to be an agent of ILT, he returned to ILT all the supplies that he had pertaining to it, at the request of ILT's executive vice president George W. Smith. ILT paid for the South Carolina State insurance license that the petitioner was required to have. During the early years of ILT's existence, it paid the petitioner's traveling expenses to and from meetings, but this practice was later discountinued. ILT usually furnished lunch to its agents at the meetings, and dinner and breakfast as well if the meeting required overnight attendance. ILT paid half the cost of birthday or Christmas cards sent out by its agents when such cards bore ILT's name as well as the agent's; however, the petitioner never sent such cards.

The petitioner did not advertise in any way. However, ILT prohibited advertising without its prior approval of the advertising copy. For an insurance company to require prior approval of the advertisements of its agents was apparently customary within the insurance industry.

ILT furnished the petitioner with lists of its stockholders as a way to help him obtain prospects for the sale of insurance. However, most of his clients were men with whom he had previously been acquainted.

At the suggestion and encouragement of Messrs. Smith and Stackhouse, the petitioner often sought new prospective clients by asking people of his acquaintance for "leads." When such leads proved productive, the petitioner often rewarded the person supplying the leads with a gift of cash or merchandise. Messrs. Smith and Stackhouse often suggested to the petitioner that he recruit the help of his cousin, James F. Ellison, to obtain the names of prospects, because the petitioner's cousin had many acquaintances in another city in South Carolina. Apparently, a document was prepared in which James F. Ellison was named as a subagent of the petitioner, pursuant to the petitioner's right under the 1957 agency agreement to hire subagents subject to ILT's approval. However, the function performed by James F. Ellison was apparently no different than that performed by other friends and acquaintances of the petitioner: James F. Ellison provided leads and prospects for the petitioner, and the petitioner paid him "as a gratuity for his assistance."

In addition to selling policies, the petitioner was required by ILT to perform certain other functions for the company, for which he received no additional compensation. ILT issued "profit-sharing" coupons or certificates to existing policyholders, and the petitioner, as

agent, was required by the home office to deliver these coupons or certificates to the policyholders and obtain receipts therefor. The certificates had monetary value in the hands of the policyholders. In addition, the petitioner was required to contact people whose checks to ILT had been canceled, or returned for insufficient funds.

Beginning in November 1963, ILT required each of its agents to have each policyholder to whom he delivered such a certificate complete and sign an affidavit supplied by ILT asking the policyholder to certify that the agent had reviewed the benefits of his policy with him, asking him whether or not he is pleased with his policy and would recommend it to others, and asking him to recommend the names of four other prospective buyers of insurance. In a bulletin addressed to all agents, ILT emphasized that the agents were *"required"* to have the policyholders complete the affidavits. In a letter to Mr. Evans, who had apparently fallen behind with respect to getting the affidavits, Mr. Smith again stressed that it was a *"requirement"* that he do so promptly.

Part of ILT's training program consisted of meetings attended by executives representing the home office and agents including the petitioner. When the meetings were held in Mullins, S.C., about 200 miles from the petitioner's home, he did not attend regularly because of the distance; but when the site of the meetings was changed to the more central location of Columbia, S.C., the petitioner was required to and did generally attend the meetings, which were held monthly. An agent arriving after the appointed time of the meeting would sometimes find that the door was locked and would be refused admittance.

ILT required its agents to use certain specified "canned speeches" in making sales presentations to potential clients. On frequent occasions, various agents were picked at random and were required to make such speeches from memory at the monthly meetings, and they were criticized if the presentation was not verbatim as specified by ILT. The agents were graded on various aspects of how well they delivered their speeches at the meetings. On other occasions, the agents were required to write one of the specified sales speeches from memory "on their honor" and send it in to the company by mail. Such written presentations were later returned to the salesmen with errors pointed out and corrections made.

On certain occasions when an agent did not give the specified sales talk in an acceptable manner, ILT prohibited the agent from selling insurance until he had learned the talk. Sometimes ILT insisted that an agent who gave an unacceptable presentation of the sales talk enter a training school for several days, during which time the agent had to learn the sales talk, write it, practice it, listen to tape recordings of it,

and then give acceptable written and oral presentations of it to company officials. After the agent had written the speech from memory, the company official corrected it and criticized it, and when he was satisfied with the presentation, the agent could resume his selling activities. Mr. McMillan was denied the right to sell insurance for a couple of days because of failing to give an acceptable presentation of the sales talk; Mr. Evans had his right to sell taken away for about a week in December 1963 for failing to satisfy ILT officials with his presentation of certain sales talks and with his use of the audiovisual machine.

ILT used a sales technique whereby the agents showed to their prospective clients a film describing the attractions of the ILT policy. The film showings were done by means of an "audio-visual machine," which the company sold to its agents by deducting a portion of the sales price from the agent's monthly commission check. The petitioner acquired such a machine in 1961, soon after its use was begun by ILT, but found it to be of little use to him and soon returned it. In 1964, however, ILT required its agents to use the machine, and the petitioner once again received one. Because of the requirement, he kept it and paid $10 per month toward its purchase price until the termination of his contract with ILT about 6 months later, whereupon he returned the machine to the company.

The operation of the audiovisual machine was another subject on which agents could be examined at random at the meetings in Columbia. Each agent had to bring the machine, as well as sales literature, to the meetings, because no one knew when he would be called upon to simulate a sales demonstration to a prospective customer.

Early in the association between the petitioner and ILT, Mr. Stackhouse sent the petitioner a document entitled "Bunk's Formula to BIG SUCCESS," the major part of which was called "WORK SCHEDULE." The same daily schedule was to be followed from Monday through Thursday; the schedule for such a day provided:

| | |
|---|---|
| 6:00 to 6:30 a.m_____ | Review and rehearse specific close in Sales Talk. (Write—say orally (ENTHUSIASTICALLY)—same close all week). |
| 6:30 to 7:00 a.m_____ | Read something inspirational: Bible—Trade Magazine—Book, etc. |
| 7:00 to 8:00 a.m_____ | Family Hour: Bath—Breakfast—etc. |
| 8:00 to 9:00 a.m_____ | Planning hour: Complete all detail work — applications — correspondence. Think about and plan each individual interview for day—what and how you plan to sell—best time and way to contact. Conserve time and effort by working in small area. |

| | |
|---|---|
| 9:00 to 6:00 p.m. | Carry out plans—as many calls as you can. Call specifically for interviews to show your film or for closing interview. Give your *definite presentation* to every suspect—don't alter—leave out parts, etc. Glamorize your superior product by enthusiastically telling its good features. Set the stage—control the interview. Don't explain or answer every question or objection in detail—use the closes to show features and advantages of IIP. Hold conversation on track by giving talk and the closing (with closes) as much as possible. Get at least two new names (qualified) from every interview. PROSPECT ALL THE TIME. Get minimum daily Goals—10 Calls—2 Showings or closing interviews—1 Sale. 4 GOALS—AT LEAST 6 CLOSING INTERVIEWS EACH WEEK. |
| 6:00 p.m. til | Relax—enjoy self and family—do extra reading or self improvement. Recharge batteries for next day's work. Have at least one evening interview each week (by appointment). |

For Friday, the schedule was the same from 6 to 8 a.m., but thereafter provided:

| | |
|---|---|
| 8:00 to 12:00 | Planning hours: Complete all records—prospect cards and inventories—correspondence or detail work not completed for the past week. Write down 40 names to call on before Thursday night. Arrange as many interviews as possible by phone in advance. Think about the sale and easiest way to contact suspects under most favorable circumstances. |
| 12:00 noon | Knock off for the week—(this time is important for your leisure and personal affairs). |

With respect to the agents' daily schedules, the company said, "Your job is to do each planned day's work each day."

At the end of each week, the petitioner and the other agents had to mail to ILT a "Calls to Clients" book reporting on their activities for the week. The book had to reach the home office by Monday. It contained a list of people on whom the agent had planned to call, and a list of people on whom he actually did call. As to each prospective client, it indicated whether or not the agent asked him to buy. It stated how many of the calls were to new prospects, and how many

were to prospects previously contacted. It also indicated whether or not the agent used the audiovisual machine and film during each sales presentation, and how many hours the agent spent each day working in the office and in the field. If a sale was made, this book recorded the face amount of the insurance coverage sold and the amount of the premium generated by the sale. If an agent's activities as so recorded met the company's standards, the agent would be awarded "qualifying points" or "prize points" having monetary value. ILT required that the agent submit the book even for those weeks when he was sick or on vacation. A bulletin issued by ILT and addressed to "all agents" used the word "must" with respect to the agents' submitting their "Calls to Clients" books to the home office each week, on time.

ILT required its agents, including the petitioner, to take a correspondence course promulgated by one Dr. Napoleon Hill. The course, which taught "a way of life" involving "positive thinking," was supplied free of charge by the company. The petitioner was required to study the book and take a series of examinations supplied by the home office. Successful completion of the course required passing 17 tests. The petitioner, however, failed the tests he took and never completed the course. When Mr. Evans, who was also required to take this course by ILT, fell behind with the lessons, he received a letter from Mr. Smith urging him to improve his performance and reminding him that the lessons are "most *important*, a part of the *required* pattern with I.L.T."

Mr. Smith informed the petitioner by a letter dated October 29, 1963, that the petitioner's compliance with "I.L.T.'s 'Success Schedule' " would thereafter be a "requirement for association with I.L.T." The "Success Schedule" required the agent to make an acceptable presentation of ILT's sales talk, and provided for a trip to Mullins at ILT's expense to hear Mr. Smith make certain recommended presentations, and to have Mr. Smith hear the agent's own presentation. The schedule provided for other periodic checks of the sales presentation. It required each agent to make, each week, a minimum average of 30 calls to prospective clients including 8 face-to-face interviews. Of the 8 interviews, the agent was required to make use of the audiovisual machine six times. Mr. Smith wrote letters to the petitioner reminding him that ILT expected him to meet the minimum requirements set forth in the "Success Schedule." One of these letters referred to an additional weekly "minimum requirement" of $250 average premium on the "Insured Investment Plan." The home office of ILT graded the petitioner for each day's showing as recorded in the "Calls to Clients" book.

A form-letter type document distributed by ILT in 1963 headed "I.L.T. MUSTS!" told the agents, *inter alia:*

1. You've got to follow the Success Schedule.
2. You've got to show that film (minimum of 8 showings—10 interviews—16 showings a week, 4 times a day 4 days a week if you really want to succeed).
3. You've got to practice your showing procedure at least once each week!
  *       *      *      *      *      *      *
5. You've got to have a minimum of 25 quality points each day.
6. You've got to be making $1,000 a month.

During the years of the petitioner's affiliation with ILT, the company's usual means of contacting him was through the mail. The petitioner generally received two, three, or four letters a week from ILT during the years 1957 through 1964. At no time during his affiliation with ILT did he have a telephone in the mobile home in which he lived. Until about 1962, the petitioner could not be reached by telephone at all, the nearest phone being a mile and a half away. Between 1962 and the time of the petitioner's termination, ILT could and did on several occasions reach the petitioner by telephoning to another mobile home about 50 yards from the petitioner's.

The only compensation that the petitioner received from ILT was his commissions on insurance policies written. During the period of his affiliation with ILT, he had no earned income other than these commissions, and he never at any time sold life insurance for any company other than ILT.

In both 1963 and 1964, the petitioner reported his income from ILT as profit from his own business on Schedule C. In both years, he paid the self-employment tax. In neither year did he receive a W-2 form from ILT; no income tax was withheld from his commissions.

Around October or November of 1963, ILT added the requirement that each agent earn a monthly commission of $1,000. The petitioner failed to meet this requirement, and during July 1964, he received a 30 days' notice of termination of his agency.

### OPINION

The issue for decision is whether the stock option granted to the petitioner by ILT on August 27, 1957, is a restricted stock option within the purview of section 424. The answer depends upon whether the petitioner was an employee of ILT during the time he was a general agent of that company, June 25, 1957, through August 1964.

Section 421 provides that the holder of a restricted stock option within the meaning of section 424 does not realize income at the time that he exercises his option to purchase stock. To be a restricted stock

option within the meaning of section 424, it must be granted to an individual who is an employee of the granting corporation or of a related corporation at the time of the grant. Sec. 424(b) ; sec. 1.424–2 (a), Income Tax Regs. In addition, for the optionee to qualify for the special tax treatment under section 421, he must be an employee of the corporation granting the option or of a related corporation at the time he exercises the option or within 3 months prior to such time. Sec. 424(a) ; sec. 1.424–1(a)(1)(ii), Income Tax Regs. Section 1.421–7 (h), Income Tax Regs., provides that for purposes of determining whether the optionee meets the employment requirements of section 424(a) and (b), the rules of section 3401(c) and the regulations thereunder are applicable.

Section 3401(c) and the regulations thereunder define "employee" for purposes of withholding on wages. In relevant part, section 31.3401(c)–1, Employment Tax Regs., provides:

(b) Generally the relationship of employer and employee exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work to the individual who performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is not an employee.

\* \* \* \* \* \* \*

(d) Whether the relationship of employer and employee exists will in doubtful cases be determined upon an examination of the particular facts of each case.

(e) If the relationship of employer and employee exists, the designation or description of the relationship by the parties as anything other than that of employer and employee is immaterial. Thus, if such relationship exists, it is of no consequence that the employee is designated as a partner, coadventurer, agent, independent contractor, or the like.

Whether the employer-employee relationship exists in a given situation is a question of fact. *Wendell E. James*, 25 T.C. 1296, 1300 (1956) ; *Chester C. Hand, Sr.*, 16 T.C. 1410, 1414 (1951). The petitioner has the burden of proving the existence of the employment relationship between him and ILT. *Welch* v. *Helvering*, 290 U.S. 111 (1933) ; Rule 32, Tax Court Rules of Practice.

The employment relationship exists when the principal retains the *right* to direct the manner in which the work is done, and to control

the methods used in doing the work, and to control the details and means by which the desired result is accomplished. *Singer Manufacturing Co.* v. *Rahn*, 132 U.S. 518, 523 (1889); *National Labor Relations Board* v. *Phoenix Mut. L. Ins. Co.*, 167 F. 2d 983, 986 (C.A. 7, 1948), certiorari denied 335 U.S. 845 (1948); *Radio City Music Hall Corp.* v. *United States*, 135 F. 2d 715, 717 (C.A. 2, 1943); *Williams* v. *United States*, 126 F. 2d 129, 132 (C.A. 7, 1942), reversing 38 F. Supp. 536 (N.D. Ill. 1941), certiorari denied 317 U.S. 655 (1942); *Golbert* v. *Renegotiation Board*, 28 T.C. 728, 733 (1957); *J. Rene Harris*, 22 T.C. 1118, 1123 (1954); *Raymond E. Kershner*, 14 T.C. 168, 173 (1950); *A. P. Dowell, Jr.* v. *Forrestal*, 13 T.C. 845, 849 (1949); see also *Irene L. Bell*, 13 T.C. 344 (1949). For the employer to retain the requisite degree of control over the employee's activities, he is not required to "stand over the employee and direct every move that he makes"; nor does the fact that the employee has an opportunity to "exercise his own faculties in the business of the employer" negate the employment relationship. *Atlantic Coast Life Ins. Co.* v. *United States*, 76 F. Supp. 627, 630 (E.D.S.C. 1948).

Other factors relevant to determining whether an employment relationship exists are the permanency of the relationship and the extent to which the claimed independent contractor is required to exercise responsibility or judgment in the performance of the work. *United States* v. *Silk*, 331 U.S. 704 (1947). Also, it is relevant whether the principal may hire and fire at will the person doing the work, what method is used to determine the workman's pay, whether the workman stands to make a profit on the work of those working under him, and which party furnishes the tools and materials with which the work is done and the premises where it is to be done. *National Labor Relations Board* v. *Phoenix Mut. L. Ins. Co.*, supra at 986.

The parties agree as to the legal standard to be used in this case. The question, then, is whether the facts of this case show the petitioner to have been an employee or an independent contractor under the applicable law. We hold that he was an employee.

The crucial criterion, set forth in the respondent's regulations and in the case law, is whether the party for whom the services are performed, ILT, has the right to control and direct the details and means by which the individual, the petitioner, performs the services. That ILT had such a right is abundantly demonstrated by the facts.

Virtually no discretion remained with the petitioner with respect to the methods that he was to use in selling insurance. "Bunk's Formula to BIG SUCCESS" established the pattern to be followed by the petitioner each day. His attitudes were supposed to be shaped by the required Napoleon Hill correspondence course. The number of prospects on whom he was expected to call was set forth in the "Success

Schedule." The dialogue between him and his prospective clients was governed by ILT's "canned" sales talks and, where usable, the audio-visual machine and film supplied by ILT. The "Calls to Clients" book enabled ILT to check regularly the extent of his compliance with the requirements of the "Success Schedule." It also revealed to the company how many hours the petitioner spent working in and out of his office each day. When an agent, including the petitioner, fell short of meeting one requirement or another, he was reminded of his failure in a letter from one of the ILT officials.

The respondent argued that ILT's "requirements" were put forth solely to benefit the agent by helping him to be a successful salesman and thus increase his own income, and that they were really in the spirit of suggestions rather than requirements. The respondent argued that no agent was ever terminated by ILT for failure to comply with rules relating to the "Success Schedule," the "Calls to Clients" books, the "canned" sales talk, and the like.

Contrary to the respondent's argument, the factual record reveals numerous instances in which ILT stressed the mandatory nature of the petitioner's and other agents' compliance with its pronouncements, and in which ILT criticized the petitioner and other agents for failing to comply. We need not repeat what is in our Findings of Fact. Suffice it to say that ILT's near-constant use of words such as "required," "requirement," and "must" in describing its procedures to the agents carried no ambiguity, and did not suggest that the person to whom the words were directed had an option with respect to his own course of action. When an agent such as the petitioner, whose agency agreement could be terminated by ILT at any time with 30 days' notice, receives such pronouncements purporting clearly to be mandatory, it would not be reasonable to expect such a man to indulge in a game of bluff by flying in the face of the requirement and then waiting to see if he would indeed be terminated as an agent. A company which prohibited certain of its agents from selling insurance for a time when they failed to deliver properly the company's "canned" sales talk is obviously serious about its requirements. The facts demonstrate that ILT retained the requisite amount of control over the petitioner's methods of doing business to support a finding of an employer-employee relationship. The respondent's contention that ILT was concerned only with results is inconsistent with the record.

The respondent also argued that because the "Success Schedule" was not made mandatory until 1963, its requirements cannot properly be considered as evidence of whether the petitioner was an employee at the time the option was granted. However, both the regulations and the cases point out that what is crucial is whether the alleged employer has the *right* to exercise control over the manner in which

the services are performed; if he retains that right, then he is an employer whether or not he actually exercises it. Throughout the relationship between the petitioner and ILT, the company issued directives as to how the petitioner should perform his work. In view of ILT's power to terminate his agency contract at will, the petitioner reasonably believed that it behooved him to comply with such directives; but if there was any uncertainty as to whether such directives were mandatory in the early years, that uncertainty was eliminated in the later years, when ILT used stronger and stronger language to indicate the mandatory nature of the directives. By the "Success Schedule," the company made clearer that it was exercising its rights of control which existed under the 1957 agreement. If ILT exercised a right of control over a certain aspect of the petitioner's activities in 1963, while the 1957 agreement was still in effect and was still governing the relationship between the petitioner and ILT, then that right must have arisen from the 1957 agreement, and existed all the time since 1957. Indeed, we have been shown no other source from which the right could have arisen.

There are other facts in the relationship between the petitioner and ILT which are indicative of the existence of an employment relationship. Under the agency contract, the parties contemplated a continuing relationship—not one established merely to accomplish a specified objective. Yet, ILT, like a typical employer, had the power to terminate the relationship at will. In addition, the petitioner, like the typical employee, was required to perform certain services with respect to the insurance policies he sold, for which he received no additional compensation.

On the other hand, there are other circumstances which are not typical of an employment relationship. ILT did not furnish a place for the petitioner to work; nor did the company assume the responsibility for the expenses incurred by the petitioner in the course of his work. The most substantial expenses were incurred in the operation of his automobile, and those expenses the petitioner had to pay. Yet, these circumstances are less significant in this case in view of the nature of the petitioner's work. His selling activities did not require much in the way of a place to work. In any event, these circumstances are not significant enough to outweigh the inference of an employment relationship to be drawn from the high degree of control exercised by ILT over the petitioner in his work.

Evidence as to what the parties considered to be their relationship is also relevant, but in this case, that evidence is ambiguous. In the agency contract, the parties explicitly declared their intention not to create an employment relationship. ILT's failure to withhold upon the compensation paid the petitioner is also consistent with a belief by ILT that he was not an employee. On the other hand, the option

granted the petitioner was evidently designed to comply with the requirements for qualification as a restricted stock option. If the grantee met the employment requirement, all the other requirements were clearly satisfied. In calling the optionee's attention to the effect of an early disposition of the stock acquired under the option, the option gave further evidence that it was assumed to be a restricted stock option. Moreover, when Mr. Stackhouse assured the petitioner that he would not be taxable on the option, it must have been done on the assumption that the option qualified as a restricted stock option. In summary, the terms of the agency contract and the failure to withhold upon the compensation paid the petitioner tend to indicate that the parties considered the petitioner to be an independent contractor, but their treatment of the option can only be explained on the basis that they considered the petitioner to be an employee. In view of these inconsistencies, we find the provision of the agency contract to have no significance.

In conclusion, we find and hold that after reviewing all the circumstances surrounding the relationship between the petitioner and ILT, the control exercised by ILT over the petitioner in the performance of his work is indicative that he was an employee of the company.

*Decision will be entered for the petitioner.*