DANIEL M. GIEREK AND JEANNETTE I. GIEREK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gierek v. Commissioner
Docket No. 16481-92
United States Tax Court
T.C. Memo 1993-642; 1993 Tax Ct. Memo LEXIS 660; 66 T.C.M. (CCH) 1866; December 30, 1993, Filed *660 For petitioners: Philip M. Kiss. For respondent: Karen P. Wright. GOLDBERG
GOLDBERG
MEMORANDUM OPINION GOLDBERG, Special Trial Judge: This case was assigned pursuant to the provisions of section 7443A(b)(3) and Rules 180, 181, and 182. [1]
Respondent determined deficiencies in petitioners' Federal income taxes for taxable years 1988 and 1989 in the amounts of $ 7,057 and $ 7,576, respectively, and an addition to tax under section 6653(a)(1) for taxable year 1988 in the amount of $ 353. The issues for decision are (1) whether petitioners are entitled to deduct expenses incurred by petitioner Daniel M. Gierek in connection with his occupation as a stockbroker as trade or business expenses on Schedule C, or whether such expenses must be deducted as unreimbursed employee business expenses on Schedule A, and (2) whether petitioners are liable for *661 the addition to tax for negligence under section 6653(a)(1) for taxable year 1988. Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by reference. Petitioners resided at Hinsdale, Illinois, at the time their petition was filed. Petitioner Daniel M. Gierek (petitioner) worked as a stockbroker for Oppenheimer & Co., Inc. (Oppenheimer) from January through August of 1988. From September through December of 1988, and all of 1989, petitioner worked as a stockbroker for PaineWebber, Inc. (PaineWebber). Petitioner received commission income in 1988 from Oppenheimer in the amount of $ 72,477.59. He received commission income in the amounts of $ 21,332.37 in 1988 and $ 161,525.57 in 1989 from PaineWebber. Oppenheimer and PaineWebber (collectively, the companies) issued Forms W-2 to petitioner, reflecting his commission income as wages, tips, or other compensation. Each company withheld Social Security tax from petitioner's income, and PaineWebber also withheld amounts for Federal income tax during each year. Petitioner held the title of vice president at the companies. He has been a stockbroker for approximately *662 15 years, and has worked for several investment brokerage firms in addition to Oppenheimer and PaineWebber. The companies paid all required licensing fees for petitioner, and provided petitioner an office, telephones, computer equipment, market quotes via Quotron, and research materials developed by the companies. In addition to the companies' facilities and resources, petitioner used his own computer and paid for the use of other research materials and computer databases not provided by the companies. The companies provided sales assistants to assist petitioner, augmenting the assistants' compensation with funds deducted from petitioner's commission income. Petitioner paid no wages to assistants directly, but incurred some expenses each year for supplemental clerical services. The companies provided life, health, and disability insurance to petitioner, and each maintained 401(k) plans in which petitioner participated or was eligible to participate. The PaineWebber 401(k) plan was funded entirely by the company; the Oppenheimer plan involved no employer contributions for petitioner. The companies monitored their brokers' trades, checking for unusual concentrations in particular *663 securities and churning of accounts, and PaineWebber retained the right to limit a broker's concentration in positions. Managers for the companies regularly reviewed brokers' trades for compliance with the regulations of applicable regulatory agencies. Brokers' activities at Oppenheimer were monitored to ascertain that investments recommended by a broker met the profile and objectives of clients, as set forth in the forms completed for the firm when an account was established. New accounts required pre-approval of PaineWebber, and the companies required that all products sold by the brokers be approved by the companies. Brokers' outgoing correspondence was reviewed by management of the companies and copies of such correspondence were retained by Oppenheimer in a master correspondence file, as well as the broker's file. PaineWebber's internal mail handling system included a review of incoming correspondence for complaints concerning brokers. The companies required that brokers receive consent of the company before undertaking outside functions such as serving on the board of directors of a company. All speaking engagements were to be approved by the companies, and in the case *664 of PaineWebber, such approval required the submission of a script of the proposed presentation and a list of all persons attending the event at which the speech was given. The companies also mandated that brokers have no contact with the press without prior approval of the company. The companies held periodic sales meetings to acquaint their brokers with new products. While the companies could require the brokers to attend such meetings, attendance usually would not be required if an experienced broker's performance was satisfactory. Brokers were generally permitted to set their own hours at the companies, and could do some of their work from their home by telephone, but neither company would allow a broker to work exclusively from a home office or by car telephone since this would create a branch office of the company under securities regulations and impair the company's ability to properly supervise the broker. Brokers were allowed to offer discounts on trading commissions to clients within guidelines set by the companies. When a broker left the companies, all original account documents, statements, confirmations, new account forms, and correspondence with clients remained *665 the property of the company. Petitioner copied the records of clients he had dealt with but left the original records with the companies. Approximately 90 to 95 percent of the clients petitioner worked with moved their accounts to the new brokerage firm when petitioner changed companies. The companies retained the right to terminate petitioner's services, and petitioner could discontinue his association with the companies at will. Petitioner reported the commissions he received from the companies as gross receipts on Schedules C attached to petitioners' 1988 and 1989 joint Federal income tax returns. He also deducted on the Schedules C expenses which related to his securities sales activity totaling $ 54,186 and $ 56,048 in 1988 and 1989, respectively. Among the expenses incurred by petitioner in connection with his investment sales were loss error charges in the amounts of $ 16,672 in 1988 and $ 16,868 in 1989. These charges were the results of broker trading errors made by petitioner in placing buy or sell orders on behalf of clients, and were either deducted from petitioner's commission earnings, or repaid by petitioner to the companies. It is the policy of both companies *666 that brokers assume responsibility for their trading loss errors. Although, in theory, an unusually large trading loss error could result in a liability in excess of a broker's annual commission income, it is not clear on this record whether the companies would enforce the repayment requirement if doing so would negate the broker's entire income for the year. [2]
Respondent determined that petitioner was an employee of the companies during 1988 and 1989, and that the deductions petitioner claimed are therefore not allowable as trade or business *667 expense deductions on Schedule C, but are allowable as miscellaneous itemized deductions on Schedule A, subject to the 2-percent floor imposed by section 67. Petitioner likens his situation to that of a real estate broker and argues that he was an independent contractor and not an employee of the companies. In particular, petitioner points to the substantial trading loss error charges he incurred during the years at issue as indicative of independent contractor status rather than employee status, observing in his brief: There is no employment that I could possibly imagine where if an employee makes an error while working for a company as an employee, that the company itself would not be responsible for that loss. The only circumstances in which a person can reasonably find that when an error is made by an individual and that individual suffers the entire loss of his own error, he would in any commercial setting be self-employed.
Unlike petitioner, we do not find petitioner's liability for loss error charges determinative of the employee/independent contractor issue, and note that petitioner's broad statement that the charging of losses caused by errors made by a worker *668 is incompatible with employee status is without support. See Butchko v. Commissioner, T.C. Memo. 1978-209, affd. 638 F.2d 1214 (9th Cir. 1981) (racetrack teller's cash register shortages characterized as employee business expenses and deductible only as itemized deductions). The Code does not define "employee" for purposes of the issue presented by this case. We therefore must look to the common law to determine whether or not petitioner was an employee. See Packard v. Commissioner, 63 T.C. 621, 628 (1975). The existence of an employer-employee relationship is a question of fact, to be determined after examining relevant facts and circumstances and applying common law principles. Nationwide Mut. Ins. Co. v. Darden, 502 U.S.    ,    , 112 S.Ct. 1344, 1348 (1992); Matthews v. Commissioner, 92 T.C. 351, 360 (1989), affd. 907 F.2d 1173 (D.C. Cir. 1990); Professional & Executive Leasing, Inc. v. Commissioner, 89 T.C. 225, 232 (1987), affd. 862 F.2d 751 (9th Cir. 1988). *669 Since respondent determined that petitioner was an employee of the companies, petitioner bears the burden of proving otherwise. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). The courts have looked to several factors in deciding whether an employment relationship exists. Among them are the following: (1) The alleged employer's right to control the manner in which the work is to be performed; (2) whether the individual performing the work has an opportunity for profit or loss; (3) the individual's investment in the work facilities; (4) whether or not the service involved requires any special skills; (5) the permanency of the relationship between the parties; (6) whether the service rendered is an integral part of the alleged employer's business; (7) the relationship the parties think they are creating; and (8) whether the alleged employer has the right to discharge the individual. Simpson v. Commissioner, 64 T.C. 974, 984-985 (1975). No one factor is dispositive, but the courts have placed strong reliance on the element of control present in the relationship. Alsco Storm Windows, Inc. v. United States, 311 F.2d 341, 343 (9th Cir. 1962); *670 Matthews v. Commissioner, supra at 361. In determining whether an individual is under sufficient direction and control of another, so as to warrant the finding of an employer-employee relationship, the courts have often referred to the regulations promulgated under the employment tax regulations. Professional & Executive Leasing, Inc. v. Commissioner, supra at 231. Under section 31.3401(c)-1, Employment Tax Regs., an employer-employee relationship Generally * * * exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. * * * In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is not an employee.
Other factors enumerated *671 by the Employment Tax Regulations include the alleged employer's legal right to direct or control the manner in which the services are performed, although it is not necessary that this right actually be exercised; the right to discharge the service provider; and, although not necessarily present in every case, the furnishing of tools or a work space to the service provider. Additionally, those who follow an independent trade, business, or profession in which they offer their services to the public, generally are not considered employees. Section 31.3401(c)-1(b), Employment Tax Regs.
In general, an employer-employee relationship exists when an alleged employer retains the "right to control" the manner and means by which an alleged employee performs his services. Nationwide Mut. Ins. Co. v. Darden, supra at 1348 (quoting Community for Creative Non-Violence v. Reid, 490 U.S. 730, 751-752 (1989)). It is the right to control that is critical, and so we must examine not merely control actually asserted over the details of an alleged employee's performance, but also the degree to which an alleged employer may intervene to impose such control. *672 Radio City Music Hall Corp. v. United States, 135 F.2d 715, 717 (2d Cir. 1943); deTorres v. Commissioner, T.C. Memo. 1993-161. It is not necessary that the purported employer "stand over the employee and direct every move that he makes." Johnson v. Commissioner, T.C. Memo. 1993-530 (quoting Atlantic Coast Life Ins. Co. v. United States, 76 F. Supp. 627, 630 (E.D.S.C. 1948)). The precise degree of control required to find an employer-employee relationship varies with different occupations. United States v. W. M. Webb, Inc., 397 U.S. 179, 192-193 (1970). When professionals are involved, the techniques and standards of their profession cause an employer's control to be more general. James v. Commissioner, 25 T.C. 1296, 1301 (1956); Fisher v. Commissioner, 24 T.C. 269, 272 (1955). In the instant case, petitioner was accorded wide latitude in setting his own hours and in selecting the means and methods of researching and selling investment products to clients. In those *673 respects, the degree of control exercised by the companies over petitioner was minimal. Additionally, petitioner incurred some expenses for clerical help and provided some of his own research materials. There is some evidence to support petitioner's contention that he was an independent contractor. However, the preponderance of the evidence in determining petitioner's employment relationship with the companies leads us to find that petitioner was an employee. The key inquiry here is their right to control, regardless of the extent to which that control was exercised. The record shows that the companies regularly reviewed petitioner's trades and retained significant rights to control his activities. Further, the companies provided petitioner an office, equipment, assistants, insurance, and other benefits, and paid his licensing fees. Finally, the companies indicated that they considered petitioner an employee by reporting his compensation on Forms W-2 and withholding from petitioner's gross commissions, Social Security taxes, and in the case of PaineWebber, Federal income taxes. Considering all the facts and circumstances, we conclude that petitioner was an employee of Oppenheimer *674 and PaineWebber during the years at issue. Respondent's determination with respect to this issue is therefore sustained. Section 6653(a)(1) imposes an addition to tax equal to 5 percent of the underpayment of tax if any part of the underpayment is due to negligence or disregard of rules or regulations. Under certain circumstances, taxpayers may avoid the addition to tax for negligence if they relied upon the advice of a competent tax adviser. Ewing v. Commissioner, 91 T.C. 396, 422-424 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991); Conlorez Corp. v. Commissioner, 51 T.C. 467, 474-475 (1968); see United States v. Boyle, 469 U.S. 241, 250-251 (1985). The returns at issue were prepared by, or at the direction of, certified public accountant Harry A. Samonds (Mr. Samonds). Mr. Samonds has prepared petitioner's tax returns for more than 10 years. Although petitioner received Forms W-2 from the companies, Mr. Samonds advised petitioner to report the commissions he received and expenses he incurred on Schedule C. Mr. Samonds explained to *675 the Court that he made this recommendation after comparing petitioner's circumstances to the 20 factors relevant to determining employee status under common law rules enumerated in Rev. Rul. 87-41, 1987-1 C.B. 296. He cited petitioner's responsibility for trading loss errors, petitioner's use of his own computer, the fact that petitioner moved from brokerage firm to brokerage firm but essentially retained the same clients, and the substantial amounts of other expenses petitioner incurred as the key factors he considered indicative of an independent contractor rather than employer-employee relationship. Although we have decided that petitioner was an employee rather than an independent contractor, on this record we hold that petitioner was not negligent in deducting his expenses on Schedule C, as recommended by his accountant. Petitioner's reliance on Mr. Samonds' advice was reasonable and in good faith. Further, there are a number of factors present in this case that support petitioner's position. Finally, we note that the parties have not cited, nor have we found, any cases directly on point with respect to deduction of expenses incurred *676 by stockbrokers as trade or business expenses on Schedule C, rather than itemized employee business expenses. [3] Accordingly, petitioners are not liable for the addition to tax under section 6653(a)(1).
Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Grant L. Ellington, an associate manager for PaineWebber in Chicago, testified that he had known of cases where brokers had not paid back losses, and that the company would consider the circumstances and the amount of the loss in relation to the broker's commissions. He also expressed the opinion that a broker would be entitled to receive the minimum wage under Illinois law and, therefore, would be paid a minimum amount even if the loss error exceeded the broker's commissions.↩
3. In Hayden v. Commissioner, T.C. Memo. 1983-595↩ (concerning expenses deducted by a stockbroker on Form 2106, Employee Business Expenses), we stated that the issue for decision was "whether petitioner is entitled to a deduction for employee business expenses totaling $ 6,012, and, if so, whether he is entitled to deduct such expenses directly from gross income, or whether such expenses should be treated as itemized deductions", but upheld respondent's determination that the taxpayer had failed to substantiate the claimed expenses, and therefore did not reach the question of the proper method of deducting such expenses.