EDWARD L. BURNETTA, O.D., P.A., ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 6293–75, 6294–75, 6335–75, 6339–75, 6340–75.          Filed June 13, 1977.

---

[1] Cases of the following petitioners are consolidated herewith: Edward L. Burnetta, docket No. 6294–75; Charles A. Crockett and Marie Crockett, docket No. 6335–75; Charles A. Crockett, M.D., P.A., docket No. 6339–75; and Edward L. Burnetta, O.D., P.A., Employees Profit Sharing Trust, Traders National Bank, Trustee, docket No. 6340–75.

*Clifford N. Jarrett,* for the petitioners.
*John Wendell Paul,* for the respondent.

FORRESTER, *Judge:* In these consolidated cases, respondent determined the following deficiencies in petitioners' Federal income tax:

| Docket No. | Petitioner | Taxable year ending | Deficiency |
|---|---|---|---|
| 6293–75 | Edward L. Burnetta, O.D., P.A. | 7/31/70 | $915.95 |
| | | 7/31/71 | 1,612.85 |
| | | 7/31/72 | 3,085.78 |
| 6294–75 | Edward L. Burnetta | 12/31/72 | 3,444.74 |
| 6335–75 | Charles A. Crockett and Marie Crockett | 12/31/72 | 7,594.00 |
| 6339–75 | Charles A. Crockett, M.D., P.A. | 7/31/70 | 1,879.57 |
| | | 7/31/71 | 2,908.42 |
| | | 7/31/72 | 4,008.08 |
| 6340–75 | Edward L. Burnetta, O.D., P.A., Employees Profit Sharing Trust, Traders National Bank, trustee | 7/31/71 | 134.88 |

The issues presented for our decision are as follows:

(1) Whether certain medical office personnel were employees of the Burnetta corporation and/or the Crockett corporation for purposes of determining whether the corporations'

respective pension and profit-sharing plans met the coverage requirements of section 401(a)(3)[2] during the years at issue; and

(2) If the plans are determined to be nonqualified, whether such plans present a substantial risk of forfeiture for purposes of determining whether the contributions made thereto are includable in the gross income of the petitioner individuals and deductible by the petitioner corporations in the years such contributions were made.

### FINDINGS OF FACT

Edward L. Burnetta, O.D., P.A. (petitioner in docket No. 6293–75), and Charles A. Crockett, M.D., P.A. (petitioner in docket No. 6339–75), are corporations with offices in Kansas City, Kans., at the time their petitions herein were filed, and both corporations filed their respective income tax returns for the years at issue with the Internal Revenue Service Center, Austin, Tex.

Edward L. Burnetta (petitioner in docket No. 6294–75) resided in Shawnee Mission, Kans., at the time his petition was filed, and his 1972 income tax return was filed with the Internal Revenue Service Center, Austin, Tex. Charles A. and Marie Crockett (petitioners in docket No. 6335–75) are husband and wife and resided in Kansas City, Kans., at the time their petition herein was filed. Their 1972 income tax return was filed with the Internal Revenue Service Center, Austin, Tex.

Edward L. Burnetta, O.D., P.A., Employees Profit Sharing Trust, Traders National Bank, trustee (petitioner in docket No. 6340–75), was located in Kansas City, Mo., at the time its petition was filed. The trust did not file a Fiduciary Income Tax Return, Form 1041, for the taxable year ending July 31, 1971.

Petitioners in docket Nos. 6293–75, 6294–75, 6335–75, and 6339–75 prepared their respective Federal income tax returns for the years at issue on the cash receipts and disbursements method of accounting.

---

[2] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954.

Crockett is a medical doctor specializing in ophthalmology and Burnetta is a practicing optometrist. Prior to 1969, Crockett carried on his practice in Kansas City, Kans., while Burnetta was practicing in Ohio. Burnetta subsequently moved to Kansas City, and in January 1969, he and Crockett entered into a contract, the terms of which provided that Crockett would refer patients to Burnetta, furnish him with office facilities and equipment, and that they would share the net proceeds resulting from Burnetta's work.

On October 22, 1969, both the Crockett corporation and the Burnetta corporation were organized under the laws of the State of Kansas. During the years at issue, Crockett was a full-time employee of the Crockett corporation and Burnetta was a full-time employee of the Burnetta corporation. Neither individual was a shareholder, officer, or director of the corporation by which he was employed. Both operated under a written employment contract with their respective corporations and were paid a percentage of the corporation's net profits. During the years at issue, the corporations shared a common administrative office area.

On July 31, 1970, the Burnetta and the Crockett corporations each adopted an employees' pension plan as well as a profit-sharing plan. The Traders National Bank & Trust Co., Kansas City, Mo., was named trustee of each of the aforementioned plans.

For purposes of determining the employees eligible to participate, both corporations' pension and profit-sharing plans defined the term "employee" as—

any person now or hereafter in the regular service of the company for Eight (8) months, and whose customary service is for more than Twenty (20) hours per week, and more than Five (5) months in any calendar year.

Each plan further provided as follows:

When a participant shall have completed Two (2) years of continuous service with the company after becoming eligible under the plan, One Hundred (100%) Percent of his proportionate interest in his company contribution account shall become non-forfeitable * * *

If any participant shall be discharged for theft of company property or embezzlement, and convicted therefor in a court of competent jurisdiction, his proportionate interest in the trust, whether forfeitable or non-

forfeitable, shall thereupon be forfeited by him, anything to the contrary herein notwithstanding. * * *

In January 1969, Robert Keck Williams established Staff Employees, Inc. (Staff), as a corporation organized under the laws of the State of Missouri. At all times during the years at issue, Williams owned 60 percent of Staff's capital stock with the remaining 40 percent owned by his son. From its inception and during the years at issue, Williams has been Staff's chief executive officer, with the daily operation of the business supervised by Louise Moulder.

Williams holds master's degrees in industrial engineering and accounting from Ohio State University and, in addition to operating Staff, he also practices as a certified public accountant in Kansas City, Mo. During the years at issue, he provided accounting services to both the Burnetta and the Crockett corporations.

As originally conceived by Williams, Staff's business operations would involve the selection, hiring, training, and instruction of workers who would in turn be contracted out by Staff to work for other businesses and companies. In actual practice, however, Staff did not have a sufficient number of personnel to do its own screening and selection and, therefore, Staff allowed the customers to perform these functions. Staff never hired any worker without already having a position for him to fill with a current or prospective client. By the end of 1970, Staff had 10 clients to which it had contracted 11 workers, and by 1973 its business had grown to about 16 clients and 22 workers.

In operation, Staff was essentially a company that provided payroll and recordkeeping services for its clients. Its slogan was "regular employees for *your* work on *our* payroll" (emphasis in original), and its activities are more fully described in the following promotional letter that it sent to prospective clients:

Dear Employer,

Most businessmen appreciate the value of a good employee. But along with the service they perform, employees also create more work. Calculating payroll, writing checks, keeping records, making federal, state and city reports. Did you know that in 1972, a business with only one employee comes under the federal unemployment tax law? More records—more reports—more of your valuable time!

Wouldn't it be nice if you could have your employees, without the burden of payroll? Well, you can!

With our service your employees become our employees. The same loyal employees you have now, continue to work under your direction and at the rate of pay you determine; but, we do all of the work connected with payroll.

We even furnish workmen's compensation, general liability insurance, and fidelity bonds on each employee. After an adequate term of service, an employee will become eligible for voluntary group medical insurance.

The client determined the initial rate of the workers' pay as well as any subsequent increases or decreases. Staff would prepare and mail the actual salary checks after making the appropriate payroll deductions for such items as social security, Federal, and State income taxes. The checks would be prepared on the basis of time sheets filled out by the worker, approved by the client, and submitted to Staff. In most cases, the checks would be mailed to the clients' offices for transmittal to the worker by the scheduled pay date. Staff would bill the client monthly and, on occasion, would make salary payments on behalf of workers before receiving payment from the client. For this service, Staff initially received 3 percent of the workers' gross compensation as a service charge. This amount was subsequently increased to 4 percent.

The management of the Crockett corporation was vested by the corporation's board of directors in Crockett, and he was authorized by the board to hire two classes of employees: those who would be directly employed by the corporation and outside help to be provided through Staff. The purpose behind hiring this latter type of worker was to insure that the corporation's pension and profit-sharing plans would be available only to relatively long-term employees. Also, by not having to make pension and profit-sharing contributions on behalf of the short-term workers (i.e., those furnished by Staff), the corporation was able to provide higher take-home pay and thereby attract a better quality worker.

Much of the same considerations motivated the Burnetta corporation and its board of directors in authorizing Burnetta to obtain outside help through Staff.

Joan Fowler (Fowler) began working in the office of the Burnetta and Crockett corporations in February 1971. She trained under the office manager, Billie Steinmetz (Stein-

metz), for about 2 weeks before assuming the duties of office manager when Steinmetz left the employ of the corporations.

The circumstances under which Fowler was hired are as follows: She was in the doctors' offices for the purpose of having her eyes examined and noticed that Steinmetz seemed quite overworked. A few days later, she wrote to Steinmetz suggesting that if the office needed additional help she would like to be considered for a job. Sometime later, Steinmetz called and told her that a job might be available. The next day, Fowler interviewed with Steinmetz and then with Crockett. At the conclusion of these interviews, Crockett offered her a job and told her that she could start immediately because he wanted her to replace Steinmetz who was leaving in 2 weeks. She began work the following day. For the first 2 weeks of her job, she did not speak with either Williams or Moulder at Staff. After 2 weeks, she did meet with Williams, and he took a bonding application from her.

Her duties as office manager included handling the billing, insurance forms, and the other general administrative functions of the office. Although Crockett did the hiring for the office, Fowler, under Crockett's orders, would do the actual firing of employees. The scope of her office duties was initially explained to her by Crockett, Burnetta, and Steinmetz and not by any individual at Staff. In her capacity as office manager, her only contact with Williams was in connection with the accounting services he provided to the corporations, and at no time during the course of her employment did she receive any job-related instructions from Williams or anyone else at Staff.

From the time she was hired in February 1971 until December of that year, Fowler received her paychecks from Staff. The Crockett corporation's fiscal year ended July 31, and, in order to be eligible for its pension and profit-sharing plans, an employee had to serve in that capacity for at least 8 months during the year. Therefore, in order for Fowler to be eligible to participate for the fiscal year ending July 31, 1972, she would have to qualify as Crockett corporation's employee no later than December 1, 1971. Williams, Crockett, and Fowler discussed this situation and mutually agreed that as of December 1, 1971, Fowler would be released from Staff's

payroll and would thereafter be paid directly by the Crockett corporation.

In March 1969, Barbara Stephens was referred by an employment agency to the offices of Crockett and Burnetta. She spoke with the office manager, Steinmetz, and was sent by Steinmetz to see Williams for the purpose of filling out the necessary paperwork. She met with Williams and completed a Staff employment application and the forms required for bonding. She began work on March 15, 1969.

Throughout the taxable years ended July 31, 1970, 1971, and 1972, Stephens rendered services in the offices of the Crockett and Burnetta corporations and received her paychecks from Staff. Her duties consisted of handling all of the various jobs in the office, including receptionist, nurse, and bookkeeper.

During the course of her employment, Stephens had only occasional contact with Moulder at Staff. In one instance she contacted Moulder to try to obtain a pay raise and also had several conversations with Moulder regarding the limited number of hours she was working for Burnetta. This latter controversy centered around the fact that Burnetta wanted to pay Stephens for only 32 hours of work per week, and Stephens felt that she could not adequately perform her duties in such a limited amount of time. Moulder's advice was to try to perform the work in the number of hours for which Burnetta was willing to pay.

Burnetta had contracted for the services of Stephens and she was assigned to Burnetta's office by Staff which billed Burnetta, and subsequently Burnetta corporation, for all of her services. Since Burnetta accepted the entire responsibility for Stephens, the amounts paid by Burnetta to Crockett under their agreement were reduced accordingly. As Staff's customer with respect to Stephens, Burnetta determined the number of hours that she worked and her rate of pay. Stephens customarily worked 32 hours per week and, during the year ended July 31, 1972, at Burnetta's directions she was devoting about 60 percent of her time to the Burnetta corporation and about 40 percent to the Crockett corporation.

Sometime prior to July 31, 1972, Burnetta asked Stephens to work directly for the Burnetta corporation but she refused. At the time of her refusal, she was aware that, as an employee

of the corporation, she could become eligible for participation in the employee pension and profit-sharing plans. At the time of the trial of this case, Stephens was unemployed.

Margaret Richardson began working as a receptionist in the Crockett corporation's offices on October 4, 1971. Her duties were described to her by Fowler, and she never met Moulder or Williams until she had been working there for a period of time and that meeting was in connection with Williams' accounting services. Both Williams and Moulder had very little if any contact with Richardson while she was on the Staff payroll. Crockett was never particularly pleased with Richardson's work and, eventually, he released her when a more qualified employee became available. During 1972, Richardson was of the opinion that Crockett was her employer.

During the taxable years ended July 31, 1971 and 1972, Burnetta was the only individual receiving paychecks issued by the Burnetta corporation. He was also the only individual to be credited with pension and profit-sharing contributions by the corporation. Throughout these same years, Stephens rendered services in the offices of both the Burnetta and Crockett corporations and received paychecks from Staff.

During all four quarters of the taxable year ending July 31, 1972, Crockett and one other employee, Joan Dorsey, were paid directly by the Crockett corporation, and the corporation made contributions on their behalf into its pension and profit-sharing plans. During the first quarter of that year, Fowler was paid by Staff, but for the last three quarters she was paid directly by the Crockett corporation and likewise qualified for pension and profit-sharing contributions for that year.

### ULTIMATE FINDING OF FACT

During fiscal years ended July 31, 1970, 1971, and 1972, Stephens served as a full-time employee of the Burnetta corporation and during fiscal year ended July 31, 1972, Richardson and Fowler were employees of the Crockett corporation.

### OPINION

The Burnetta and Crockett corporations each established trusts for the purpose of conducting their respective pension

and profit-sharing plans. Respondent has determined that all four trusts did not qualify under section 401 for the years at issue because the plans failed to satisfy the 70-percent coverage requirement of section 401(a)(3)(A).[3] Accordingly, respondent disallowed the corporations' claimed deductions for their respective plan contributions and determined that the Burnetta trust received taxable income for its taxable year ending July 31, 1971.[4]

During its taxable years ending July 31, 1970, 1971, and 1972, the Burnetta corporation made contributions to its pension and profit-sharing plans on behalf of one employee—Burnetta. Respondent contends that Barbara Stephens should also be considered an employee of the corporation and, therefore, that its plans fail to qualify by reason of covering only 50 percent of its employees.

During its taxable year ending July 31, 1972, the Crockett corporation made contributions to its pension and profit-sharing plans on behalf of three employees—Crockett, Joan Dorsey, and Joan Fowler. Respondent's position is that Margaret Richardson was also an employee of the Crockett corporation and that Stephens, in addition to being employed by the Burnetta corporation, should also be considered an employee of the Crockett corporation for purposes of satisfy-

---

[3] The provisions contained in the Employee Retirement Income Security Act of 1974 are inapplicable to the years before us. During the years at issue, sec. 401(a)(3)(A) provided as follows:

SEC. 401(a).REQUIREMENTS FOR QUALIFICATION.—A trust created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section—

* * *

(3) if the trust, or two or more trusts, or the trust or trusts and annuity plan or plans are designated by the employer as constituting parts of a plan intended to qualify under this subsection which benefits either—

(A) 70 percent or more of all the employees, or 80 percent or more of all the employees who are eligible to benefit under the plan if 70 percent or more of all the employees are eligible to benefit under the plan, excluding in each case employees who have been employed not more than a minimum period prescribed by the plan, not exceeding 5 years, employees whose customary employment is for not more than 20 hours in any one week, and employees whose customary employment is for not more than 5 months in any calendar year, * * *

[4] There is nothing in the record before us to indicate why respondent has not determined deficiencies against the Crockett trust or against the Burnetta trust for years prior or subsequent to its taxable year ending July 31, 1971. We can only speculate that during the years under audit the trusts had no taxable income.

ing the coverage requirements of section 401(a)(3). Also, respondent contends that the Crockett plans only covered Fowler for the last three quarters of the fiscal year ending July 31, 1972, and thus did not provide proper coverage on at least 1 day of each quarter as required by section 401(a)(6).[5]

Petitioners argue that those individuals who respondent alleges are its employees were in fact employed by Staff and, thus, should not be taken into account in calculating the section 401(a)(3)(A) minimum coverage requirements.

In determining whether or not an individual is an "employee" for purposes of section 401, we must look to the common law concepts used in making such a determination. *Packard v. Commissioner,* 63 T.C. 621, 629 (1975). Whether or not two parties stand in an employer-employee relationship is a factual question. *Simpson v. Commissioner,* 64 T.C. 974, 984 (1975); *Ellison v. Commissioner,* 55 T.C. 142, 152 (1970); *James v. Commissioner,* 25 T.C. 1296, 1300 (1956); *Hand v. Commissioner,* 16 T.C. 1410, 1414 (1951).

Section 31.3121(d)–1(c)(2), Employment Tax Regs., provides one definition of this common law employer-employee relationship:

(2) Generally such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. * * *

Another definition is found in section 220 of 1 Restatement of Agency 2d:

A servant [employee] is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control.

---

[5] (6) A plan shall be considered as meeting the requirements of paragraph (3) during the whole of any taxable year of the plan if on one day in each quarter it satisfied such requirements.

We think that the facts before us quite clearly reveal that the individuals in question served as the common law employees of the respective corporations.

The corporations, through the persons of Burnetta and Crockett, did the initial interviewing and the actual hiring of their personnel. Williams and Moulder did interview applicants but it appears that such interviews were simply for the purpose of filling out the paperwork necessary for Staff to perform its payroll functions and that Staff had no voice in the actual selection of the worker. The doctors, and not Staff, fixed the initial rates of pay and determined any subsequent increases or decreases. Staff merely performed the ministerial duty of making the predetermined salary payments.

Further, the right to discharge these employees was clearly vested in the doctors acting on behalf of the respective corporations. Fowler testified that she fired employees on Crockett's orders, and Williams testified that Richardson was released because Crockett became dissatisfied with her work. At trial, Williams claimed that he, too, had the right to discharge those employees on Staff's payroll. Unfortunately, petitioners have provided no corroborative evidence to show that this was the case. There were apparently no employment contracts entered into between Staff and its "employees" granting Staff this right, and petitioners failed to call to our attention one instance in which Williams or anyone at Staff unilaterally fired or transferred anyone who worked for one of its clients. If Williams actually retained the right to discharge those workers on Staff's payroll, petitioners have simply failed to prove it.

It is also quite clear that the right to control the workers as to the result to be accomplished by their work as well as to the details and means by which the result is accomplished was vested in the doctors in their capacity as employees of the corporation and not Staff. Neither Fowler nor Stephens nor Richardson ever received any job-related instructions from Staff and complete control over the manner in which they performed their duties remained with the doctors. None of these three individuals had any substantial contact with Staff throughout the course of their employment. Stephens testified that she did speak with Moulder on several occasions for the purpose of having Burnetta increase her pay and lengthen her

working hours. While such testimony does show a certain amount of contact with Staff, it only serves to solidify in our mind that these particular elements of her employment were under Burnetta's control and that Moulder only acted as a buffer between Burnetta and Stephens.

Petitioners direct us to Stephens' refusal to accept an offered transfer from Staff's payroll to Burnetta's payroll as evidence that Staff was her common law employer. We find no such evidence of a common law employer-employee relationship from her desire to remain on Staff's payroll and think her refusal may simply have stemmed from wanting to avoid any pension and profit-sharing plan deductions from her take-home pay.

We think that Staff's operations were consistent with its advertising claims. In its promotional material it stated that, "The same loyal employees you have now, continue to work under your direction and at the rate of pay you determine, but, we do all of the work connected with payroll." In short, Staff simply relieved its business clients (including the petitioner corporations) of the burden of providing their payroll and recordkeeping functions and did not have the right to control its clients' employees in the manner normally associated with and contemplated by the typical common law employer-employee relationship.

Petitioners rely on *Packard v. Commissioner, supra,* and Rev. Rul. 75–41, 1975–1 C.B. 323. We find neither to be persuasive authority for petitioners' position. In *Packard,* three dentist-partners formed a corporation of which they were the sole shareholders, directors, and officers. The partnership transferred to the corporation, and then leased back, an office building and dental equipment. In addition, all of the partnership's employees were transferred to the corporation, with the transferred employees subject to the corporation's rules and regulations and with the corporation assuming all payroll and recordkeeping responsibilities.

Unlike the case before us, in *Packard* there was no question (and in fact the parties so stipulated) that, after the employees were transferred to the corporation, the control over their duties was specifically relinquished to the corporation and the transferred employees were supervised by the dentists acting in their capacity as officers and directors of the corporation.

In the instant case, there is absolutely no indication that Staff maintained any control over, or conducted any supervision of, the employees in the performance of their duties in the doctors' offices.

Petitioners place great importance on the fact that, like the corporation in *Packard*, Staff made the actual salary payments to the employees. However, petitioners neglect to point out that, unlike the situation in *Packard*, there was indeed a clear and evident relationship between the amounts paid to Staff by the petitioner corporations and the salary payments made by Staff to the employees. The salaries were determined by the corporations (specifically, by Burnetta and Crockett), and Staff merely served the function of collecting such amounts from the corporations, making the appropriate payroll deductions, and mailing the salary checks either directly to the individuals or to the corporations for eventual delivery to the individuals. We see this as merely a payroll service operation and lacking the substance necessary to create a common law employer-employee relationship.

In addition, the factual situation in *Packard* was complicated by an element missing in the instant case, viz, the common control exercised by the dentists over the corporation and the partnership. In *Packard*, we refused to ignore the corporate entity for purposes of section 401, preferring instead to rest our finding on a determination as to which entity performed the significant functions of the common law employer. There is no contention in the case before us that Staff's corporate existence should be ignored nor is there any common control of the corporate entities involved. We are faced here simply with determining who is the common law employer, and the facts presented leave no doubt in our mind that the petitioner corporations so qualify.

We likewise find the factual situation described in Rev. Rul. 75-41, *supra*, clearly distinguishable. In that ruling the service corporation recruited, tested, hired, and instructed the workers involved, while in the case before us these functions were performed by the petitioner corporations. Another element in that ruling missing from the facts of the instant case is the existence of employment contracts between the service corporation and the workers, the terms of which the subscribers had no right to alter. In sum, the facts of the

revenue ruling indicated that the right to control was vested in the service corporation and not the subscriber, while the facts before us reveal exactly the opposite.

Having determined the common law employer, we must now focus on the specific percentage coverage requirements imposed upon the two petitioner corporations. During the years at issue, the Burnetta corporation provided pension and profit-sharing plan coverage to only one employee—Burnetta. The evidence presented shows that Burnetta hired Stephens on March 15, 1969, determined her rate of pay and working hours, and controlled the details of her work. Moreover, we agree with respondent's position as expressed in Rev. Rul. 67–101, 1967–1 C.B. 82, that Stephens should not be treated as working less than 20 hours a week for the Burnetta corporation simply because, at Burnetta's direction, she spent approximately 40 percent of her time performing duties for Crockett. Accordingly, we find that she also was employed by the Burnetta corporation during the years at issue and that the corporation's pension and profit-sharing plans do not qualify under section 401 by reason of providing coverage to only 50 percent of the employees.

During each quarter of the fiscal year ending July 31, 1972, both Crockett and Dorsey were covered by the Crockett corporation's pension and profit-sharing plans. We have found that both Fowler (hired February 1971) and Richardson (hired October 4, 1971) were common law employees of the corporation during the relevant period. Under section 401(a)(3)(A), however, Fowler and Richardson need not be counted as employees for purposes of the specific percentage coverage requirement, until they have satisfied the 8-month minimum service requirement of the Crockett corporation's pension and profit-sharing plans. The earliest that Fowler could have satisfied the 8-month minimum service requirement (assuming she was hired February 1, 1971) was October 1, 1972, and Richardson did not satisfy such requirement until June 4, 1972. Therefore, *if Stephens was not a full-time employee of Crockett,* the Crockett plans qualify for the fiscal year ending July 31, 1972, because they satisfy the specific percentage

coverage requirements of section 401(a)(3)(A) on at least 1 day of each quarter of the fiscal year. Sec. 401(a)(6).[6]

Section 401(a)(3)(A) provides for excluding "employees whose customary employment is for not more than 20 hours in any one week." However, respondent argues that Stephens was a full-time employee of *both* the Burnetta *and* Crockett corporations during the taxable year ended July 31, 1972, because she customarily rendered services to both corporations in the aggregate of 32 hours per week.

As stated *supra,* we agree that Stephens was a full-time employee (as opposed to a part-time or seasonal employee) for section 401(a)(3)(A) purposes. However, the facts clearly indicate that Stephens was the full-time employee of Burnetta corporation *only* and not of Crockett corporation. It is clear that Stephens worked primarily for Burnetta corporation. Burnetta, and subsequently Burnetta corporation, contracted with Staff for the services of Stephens and paid Staff for her services. Stephens did most of the Burnetta corporation's work. She worked 60 percent of her time for Burnetta corporation and Burnetta controlled the details of her work. Burnetta determined the total number of hours that she worked as well as her rate of pay. At trial, when asked who her employer was, Stephens initially replied "Dr. Burnetta," and she testified that Burnetta had asked her to work directly for the Burnetta corporation but she refused. Therefore, since

----

[6] For the first quarter (Aug. 1, 1971—Oct. 31, 1971) of the fiscal year ended July 31, 1972, Crockett and Dorsey were covered for the entire period, Fowler need not be counted as an employee until Oct. 1, because she will not have fulfilled the minimum service requirement until then, and Richardson need not be counted at any time during the quarter. Therefore, on at least 1 day of such quarter 100 percent of Crockett's employees were covered.

For the second quarter of such fiscal year (Nov. 1, 1971—Jan. 31, 1972), Crockett and Dorsey were covered the entire quarter, Fowler was covered as of Dec. 1, 1971, and Richardson need not be counted because she had not satisfied the minimum service requirement. Therefore, on at least 1 day of such quarter 100 percent of Crockett's employees were covered by the plans.

For the third quarter (Feb. 1, 1972—Apr. 30, 1972), Crockett, Dorsey, and Fowler were all covered by the plans, and Richardson still need not be counted as an employee so that 100 percent of Crockett's employees were covered during such quarter.

In the fourth quarter (May 1, 1972—July 31, 1972), Crockett, Dorsey, and Fowler were covered and Richardson need not be counted as an employee until June 4, 1972. Therefore, on at least 1 day of such quarter 100 percent of Crockett's employees were covered by its plans.

Stephens worked primarily for the Burnetta corporation, we cannot find that she was also a full-time employee of Crockett merely because, at Burnetta's discretion, she spent 40 percent of her time rendering services to him. Accordingly, we believe that the circumstances of Stephens' employment are factually distinguished from that covered by Rev. Rul. 67–101, *supra,* and hold that Stephens was not an employee of Crockett for section 401(a)(3)(A) purposes. It follows that the Crockett plans meet the specific percentage coverage requirements of section 401(a)(3)(A) and qualify under section 401 for the taxable year ended July 31, 1972.

The second and final issue presented for our consideration concerns the deductibility by the Burnetta corporation of its plan contributions and the inclusion of such amounts in Burnetta's gross income.

For the taxable years before us, the question of whether contributions made to pension and profit-sharing plans are includable in an employee's gross income is governed by section 402(b).[7] This section (applicable to contributions made after August 1, 1969) generally provides that the contributions are includable if such amounts would be includable in the employee's gross income under the provisions of section 83. Section 404(a)(5),[8] which deals with the deductibility by an

---

[7] SEC. 402. TAXABILITY OF BENEFICIARY OF EMPLOYEES' TRUST.

(b) TAXABILITY OF BENEFICIARY OF NONEXEMPT TRUST.—Contributions to an employees' trust made by an employer during a taxable year of the employer which ends within or with a taxable year of the trust for which the trust is not exempt from tax under section 501(a) shall be included in the gross income of the employee in accordance with section 83 (relating to property transferred in connection with performance of services) * * *

[8] SEC. 404. DEDUCTION FOR CONTRIBUTIONS OF AN EMPLOYER TO AN EMPLOYEES' TRUST OR ANNUITY PLAN AND COMPENSATION UNDER A DEFERRED-PAYMENT PLAN.

(a) GENERAL RULE.—If contributions are paid by an employer to or under a stock bonus, pension, profit-sharing, or annuity plan, or if compensation is paid or accrued on account of any employee under a plan deferring the receipt of such compensation, such contributions or compensation shall not be deductible under section 162 (relating to trade or business expenses) or section 212 (relating to expenses for the production of income); but, if they satisfy the conditions of either of such sections, they shall be deductible under this section, subject, however, to the following limitations as to the amounts deductible in any year:
* * *
(5) OTHER PLANS.—If the plan is not one included in paragraph (1), (2), or (3), in the taxable year in which an amount attributable to the contribution is includible in the gross income of employees participating in the plan * * *

employer of contributions made to nonqualified pension and profit-sharing plans, likewise keys into section 83 and provides that the deduction is allowed if and when the contributions are includable in the employee's gross income under that section.

Therefore, the proper resolution of this second issue rests upon whether, under the provisions of section 83, the contributions made by Burnetta corporation are includable in the gross income of the employee on whose behalf they were made. Section 83 provides in pertinent part that if property is transferred to an individual in connection with that individual's performance of services, such property is includable in the individual's gross income in the first year in which his rights in the property are not subject to a "substantial risk of forfeiture." Section 83(c)(1) defines this term as follows:

SEC. 83(c). SPECIAL RULES.—For purposes of this section—

(1) SUBSTANTIAL RISK OF FORFEITURE.—The rights of a person in property are subject to a substantial risk of forfeiture if such person's rights to full enjoyment of such property are conditioned upon the future performance of substantial services by any individual.

The plans at issue in the instant case provide that an employee's proportionate interest in his company contribution account will be nonforfeitable after 2 years of continuous service with the company. Each plan, however, contains a qualifying provision that states as follows:

If any participant shall be discharged for theft of company property or embezzlement, and convicted therefor in a court of competent jurisdiction, his proportionate interest in the trust, whether forfeitable or non-forfeitable, shall thereupon be forfeited by him, anything to the contrary herein notwithstanding. * * *

The parties are in agreement that the resolution of the issue before us depends upon whether the above-quoted provision results in subjecting the employee's rights in the plan contributions made on his behalf to a "substantial risk of forfeiture." We hold that such provision does not so subject his rights and that the plan contributions are therefore includable in petitioner Burnetta's gross income and deductible by the Burnetta corporation once the employee's rights become otherwise vested.

Prior to 1969, section 404(a)(5) provided that plan contributions would be includable in an employee's gross income if

such employee's rights were "nonforfeitable." The regulations applicable to this section defined "nonforfeitability" as a beneficial interest in which there was no contingency that would cause the employee to lose his rights in the contribution. Under this pre-1969 standard, the law was quite clear that the mere possibility that benefits could be lost through the commission of criminal acts or misconduct constituted a contingency that resulted in the employee's rights being forfeitable and that such amounts would therefore not be includable in his gross income. *Pollnow v. Commissioner*, 35 T.C. 715 (1961); *Liberty Machine Works, Inc. v. Commissioner*, 62 T.C. 621 (1974); *Comprehensive Designers International, Ltd. v. Commissioner*, 66 T.C. 348 (1976).

For plan contributions made after August 1, 1969, however, the standard is that set forth in section 83, viz, whether there exists a *substantial* risk of forfeiture of the amounts so contributed on the employee's behalf. Thus, in the instant case, the inquiry becomes not whether there is *any* contingency that would cause the amounts to be forfeited, but rather whether such contingency is substantial. We are convinced and so hold that the possibility that a Burnetta corporation employee would be discharged and convicted for theft or embezzlement of corporation property is too remote to present any substantial risk that the amounts contributed on his behalf will be forfeited. Respondent has issued proposed regulations under section 83, and we note that our holding herein comports with his position as expressed in those regulations. Proposed reg. 1.83–3(c)(1), 36 Fed. Reg. 10787 (1971).

*Decisions will be entered under Rule 155.*