HARRY E. PULVER AND THELMA J. PULVER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pulver v. Commissioner
Docket No. 4886-79.
United States Tax Court
T.C. Memo 1982-437; 1982 Tax Ct. Memo LEXIS 305; 44 T.C.M. (CCH) 644; T.C.M. (RIA) 82437; August 2, 1982. *305 P was employed by GEC as a chief engineer. Additionally, GEC paid P a percentage of the selling price of inventions created by P and marketed by GEC. Held: although P was employed by GEC as a chief engineer he was also a self-employed inventor. Accordingly, contributions made by P to a self-employment retirement plan are deductible and interest earned thereon is nontaxable. John M. James, for the petitioners. Mark Pridgeon, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Year
Deficiencies
1974
$623
1975
2,562
1976
3,912
The issues presented for decision are whether petitioners are entitled to a deduction for contributions made by petitioner Harry E. Pulver to a self-employment retirement plan (H.R. 10 plan) and whether interest income earned by the retirement trust is properly excludable from petitioner's gross income. These issues are inextricably tied to the question of whether petitioner was self-employed in the development of inventions or whether his status was that of an employee. FINDINGS OF FACT Some of the facts have been stipulated. These facts together with the exhibits attached thereto are incorporated *308 herein by this reference. Petitioners Harry E. Pulver and Thelma J. Pulver resided in Wayzata, Minnesota, at the time they filed their petition herein. Joint Federal income tax returns were filed by petitioners for the years 1974, 1975, and 1976. In 1971 Harry E. Pulver (hereinafter petitioner) accepted a position as chief engineer with the Garlock Equipment Company (Garlock Equipment). The company is engaged in the manufacture of equipment for the roofing industry. Russell D. Garlock, then president and owner of the company, invented numerous products which were ultimately marketed by Garlock Equipment. Petitioner, prior to his employment with Garlock Equipment, was employed by a competitor of Garlock Equipment in the roofing industry, Aeroil Products (Aeroil). At Aeroil petitioner received no additional compensation for any of his inventions which Aeroil marketed. Therefore, petitioner sought an association with one of Aeroil's chief competitors. Garlock Equipment would not have hired petitioner but for his ability to develop new products. In 1967 petitioner instituted design work for the invention of the Big Swede tar kettle (Big Swede). The Big Swede is a tar *309 melting device capable of holding up to an 800 gallon volume. The kettle is mobile through the use of attached trailer wheels and is employed to melt asphalt for use on roofs. Petitioner, in an independent effort, fully developed the Big Swede at least 2 years prior to his employment with Garlock Equipment. In August of 1971 the initial employment agreement between petitioner and Garlock Equipment was executed. It provided for an annual salary of $16,000. Additionally, Garlock Equipment agreed to pay petitioner 1-1/2 percent of the selling price of any new products that petitioner was instrumental in developing for Garlock Equipment. The terms of the original agreement were amended by the parties in October of 1974 by a document captioned "Royalty Agreement." The agreement provides: Garlock Equipment Co. agrees to employ Harry E. Pulver on a salary basis as Chief Engineer to supervise the engineering department. Garlock Equipment Co. also agrees to pay Harry E. Pulver a royalty on any new products designed and developed as a free lance designer for the Garlock Equipment Co. This royalty will be 6% on the selling price of the products sold. In October of 1976 petitioner's *310 association with Garlock Equipment was further defined through the execution of two agreements. One agreement delineates the terms of the employer-employee relationship and provides as follows: HARRY E. PULVER and GARLOCK EQUIPMENT CO., agree to the following: 1. Harry E. Pulver will be employed by the Garlock Equipment Co. for a period of ten (10) years beginning September 1, 1976, but after five (5) years, this agreement will be reviewed and the salary and benefits will either remain the same or be increased. 2. Harry E. Pulver will be paid $3,000.00 per month by Garlock Equipment Co. and each year on September 1st, Pulver's previous year's monthly salary will be increased by 2 1/2 - 5% plus an additional percent each year based upon the annual increase in the 1967 Consumer Price Index published by the United States Bureau of Labor Statistics. 3. During the first five (5) years of this agreement, Harry E. Pulver is to have three weeks paid vacation per year and four weeks paid sick leave each year. During the last five (5) years of this agreement, Harry E. Pulver shall have five weeks of paid vacation per year and six weeks of paid sick leave each year. 4. Harry *311 E. Pulver's main duties are chief engineer, production supervisor and purchasing agent. He will be provided with necessary assistance to complete these duties. 5. Harry E. Pulver is to have all fringe benefits, including hospitalization, pension and profit sharing and bonuses to which all other employees on his level receive, as well as the company will provide him with a full size station wagon or automobile insured and maintained at the company's expense, including all gas for business use. 6. This agreement is an asset and obligation of Garlock Equipment Co. and will remain an asset and obligation of the company no matter who owns the company or who manages the company. 7. Garlock Equipment Co. by its President, represents that this agreement is entered into with the full authority of the stockholders and the Board of Directors who have approved the terms. 8. Any dispute between Harry E. Pulver and Garlock Equipment Co. will be submitted to the American Arbitration Association for determination before either party can engage in any legal action. The second agreement, executed by Garlock Equipment and Walser Equipment Co., petitioner's sole proprietorship, sets *312 out the terms relating to petitioner's inventions. It provides: WALSER EQUIPMENT CO. and GARLOCK EQUIPMENT CO. agree to the following: 1. Walser Equipment Co. will provide design, and production concepts to Garlock Equipment Co. 2. On all items on the attached list, which is a part of this agreement, Walser Equipment Co. will receive a commission of 6% on the gross sale of all items sold by Garlock Equipment Co. On additional items added to the attached list, Walser Equipment Co. will receive a commission of 8% on all gross sales of these items sold by Garlock Equipment Co. 3. If there are any modifications or changes in any item listed on the list, Walser Equipment Co. will still receive the above commissions as long as the basic design, or production concept remains. 4. Walser Equipment Co. has the right to patent any of the items which it designs for Garlock Equipment Co., Garlock Equipment Co. will be entitled to the exclusive right to sell these items on the above commission basis. 5. Garlock Equipment Co. will pay Walser Equipment Co. the above commissions during all times that any of the items on the attached list are sold but not for a period longer than *313 January 1, 1988, unless an additional written agreement is made. 6. By the fifth day of each month, Walser Equipment Co. will be paid its commission for the items sold and invoiced by Garlock Equipment Co. in the previous month. Walser Equipment Co. has the right to inspect, monthly, all records of Garlock Equipment Co. showing sales of these items. 7. Walser Equipment Co. has a security lien interest on the items on the attached list and if Garlock Equipment Co. is sold, liquidated, or merges with another company this security lien interest shall survive as a claim for commissions from the buyer, person or company which sells any of these items. 8. Walser Equipment Co. can work for companies other than Garlock Equipment Co. doing design and production concepts, but Walser Equipment Co. agrees not to work for any company competing directly with Garlock Equipment Co. 9. Garlock Equipment Co. has the right to refuse any item designed by Walser Equipment Co. and may buy from any other company it wishes. Walser Equipment Co. has the right to supply any of its designs and productions concepts or items to any other company and for any other purpose other than to compete *314 with Garlock Equipment Co. 10. Garlock Equipment Co. by its President, represents that this agreement is entered into with the full authority of the stockholders and the Board of Directors who have approved the terms. 11. Any dispute between Walser Equipment Co. and Garlock Equipment Co. will be submitted to the American Arbitration Association for determination before either party can engage in any legal action. ATTACHED LIST
We agree that Walser Equipment Co. will be paid 6% commission on the gross sales of the following items sold by Garlock Equipment Co. 1.
Swede Kettle
Mini 100 Gal.
Nordic 200 Gal.
Viking 300 Gal.
Big Swede 410 Gal.
King Swede 600 Gal.
Giant Swede 800 Gal.
2.
Automatic Gas Control
HiLo
100 %
3.
Trash Chute
4.
Shingle Tearoff Bar
5.
Hoist Hook
800 lb.
500 lb.
6.
Roller Carrier
7.
Mini Pump
8.
Kerosene Torches
9.
Kerosene Press Pump
10.
Hot Water Kettle
11.
Cool Swede (cold material kettle)
200 Gal.
400 Gal.
12.
Pallet Picker
13.
Roof Dyer 2 models (1) self contained (2) add on
14.
Ladder Platform Hoist
200 lb.
400 lb.
15.
36ft. Belt Conveyor
Petitioner's duties *315 as chief engineer of Garlock Equipment included the following: Supervision of product liability claims; review of company purchases; inspection of finished goods; response to customer inquiries regarding replacement parts and the use and malfunction of products; and the writing of operational instructions for all Garlock Equipment products. Petitioner designed his inventions at his residence. Garlock Equipment did not furnish any equipment or facilities used in connection with the design work. The genesis of petitioner's creations were the fruits of his own expertise and imagination. Once an idea occurred to petitioner he would pursue his design work according to his own time schedule. Garlock Equipment had no control over petitioner's inventive activities. Products invented by petitioner relating to the roofing industry had to be offered to Garlock Equipment for marketing. Petitioner was free to develop and market all other inventions. A hear exchanger, a log splitter and a vacuum device were developed by petitioner during the years in issue but none of these was successfully marketed. In prior years petitioner developed several inventions while operating as an independent *316 enterprise, none of which was met with a marketing success. As noted earlier, petitioner, prior to the commencement of his association with Garlock Equipment, designed the Big Swede tar kettle. The product was marketed by Garlock Equipment and resulted in 20 percent to 25 percent of Garlock Equipment's total sales for the years in issue. Subsequently, Garlock Equipment marketed several other inventions designed by petitioner but the bulk of petitioner's income from inventions was realized through the marketing success of the Big Swede. When petitioner began his association with Garlock Equipment, the company was marketing approximately 300 products developed by its owner, Russell D. Garlock. On occasion Garlock Equipment would seek outside assistance in the area of product design. During the years in issue petitioner received the following amounts of income from inventions, all of which were paid by Garlock Equipment: 1974
- $16,172.00
1975
-  39,182.41
1976
-  46,669.73
Petitioner's expenses attending his design work were minimal. In late 1974, petitioner established an employee pension benefit plan (H.R. 10 plan) for himself with respect to *317 income acquired as an alleged self-employed inventor. Petitioner's contributions to the plan for the years in issue which were deducted from petitioner's gross income were as follows: 1974
- $2,000.00
1975
-  5,797.00
1976
-  6,899.00
Additionally, the contributed funds resulted in interest income of $345 and $597 to the retirement trust in 1975 and 1976 respectively. Petitioner excluded these amounts from his gross income. In his notice of deficiency dated January 23, 1979, respondent disallowed petitioner's deductions for contributions made to his retirement plan and determined that interest income earned by the retirement trust in 1975 and 1976 is properly includable in petitioner's gross income for these years. OPINION Both issues in the instant dispute concern the establishment of petitioner's self-employment retirement plan. More specifically, we must resolve whether petitioner was a self-employed inventor during the years in issue. Certain contributions by self-employed persons to qualified retirement plans are deductible. Section 404(a)(8). [1] Section 401 sets out the requirements for plan qualification and states the general rule that *318 a qualified plan must be established by an employer for the exclusive benefit of his employees. The rules relating to self-employed individuals for purposes of section 401 are found in sections 401(c) through 401(e). Section 401(c)(1) provides that the term "employee" includes for any taxable year any individual who has earned income for the taxable year. "Earned income" is defined as "the net earnings from self-employment (as defined in section 1402(a))." Section 401(c)(2). Section 1402(a) provides that "net earnings from self-employment" means "the gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by this subtitle." Generally, the term "trade or business" when used in reference to self-employment income does not include the performance of services by an individual as an employee. Section 1402(c)(2). Accordingly, the issue of the qualification of petitioner's retirement plan hinges upon whether petitioner was a self-employed inventor or whether his inventions were created in his *319 status as an employee at Garlock Equipment. Should we find, as petitioner argues, that petitioner was self-employed, then contributions to the retirement trust are deductible and interest earned by the trust is excludable from petitioner's gross income. If, on the other hand, we find persuasive respondent's assertion that petitioner was a common-law employee, then all contributions to the plan are nondeductible and interest earned is properly includable in petitioner's gross income. The determination of whether an individual is an employee within the context of section 401(c) rests on an application of common law concepts. Cf. Simpson v. Commissioner,64 T.C. 974, 984 (1975); Packard v. Commissioner,63 T.C. 621, 629 (1975). Whether or not two parties stand in an employer-employee relationship is a question of fact. Air Terminal Cab, Inc. v. United States,478 F.2d 575 (8th Cir. 1973); Burnetta v. Commissioner,68 T.C. 387, 397 (1977); Simpson v. Commissioner,supra.
The test generally considered fundamental in resolving the question of whether an individual is an employee is the degree *320 of control exercised by the person for whom work is performed over the individual who renders the service. See Packard v. Commissioner,supra; cf. section 31.3401(c)-1, Employment Tax Regs. However, the degree of control necessary for a finding of employee status varies with the nature of the services provided by the worker. Thus, where the inherent nature of the job mandates an independent approach, a lesser degree of control exercised by the one benefitting from the service rendered may result in a finding of an employer-employee relationship. See James v. Commissioner,25 T.C. 1296, 1301 (1956). For example, the threshold level of control necessary for a finding of employee status is generally lower when applied to professional services than when applied to nonprofessional services. Compare Azad v. United States,388 F.2d 74 (8th Cir. 1968) (radiologist found not to be an employee of a hospital) and James v. Commissioner,supra (pathologist was an employee of a hospital) with Air Terminal Cab, Inc. v. United States,supra (taxicab drivers held to be employees of taxicab companies) *321 and Alsco Storm Windows, Inc. v. United States,311 F.2d 341 (9th Cir. 1962) (window installers were employees since corporate manager had the power to instruct installers as to the way a job should be done). In the instant case, petitioner's inventive activities were akin to common professional services in that they required petitioner's independence of thought and approach. Thus, while we search for only a modicum of control exercised by Garlock Equipment over petitioner respecting his creative efforts, we find that Garlock Equipment exercised no such control. Accordingly, we hold that petitioner was a self-employed inventor with respect to inventions developed by petitioner and marketed by Garlock Equipment. Petitioner's association with Garlock Equipment was two faceted. First, petitioner was employed as chief engineer of Garlock Equipment. His well-defined duties in that capacity were the supervision of product liability claims, review of company purchases, inspection of finished goods, response to customer inquiries and the writing of operational instructions for products. Petitioner's regular working day was occupied by attending to these responsibilities *322 and he received a salary for these efforts. Second, petitioner was involved in the development of inventions for Garlock Equipment. Such development work was dissimilar from petitioner's duties as chief engineer. Petitioner's inventions were marketed by Garlock Equipment under an arrangement whereby petitioner was paid a fixed percentage of the selling price of the products so marketed. Petitioner's most successful invention, the Big Swede, was developed at least 2 years prior to petitioner's association with Garlock Equipment. Thus, it is obvious that Garlock Equipment exercised no control over petitioner in the evolution of his most fruitful product. Furthermore, as to petitioner's inventive activities after commencement of his association with Garlock Equipment, it is clear that petitioner was free to invent the product of his own imagination. Nor were there any time frames or deadlines which petitioner was expected to meet. Additionally, petitioner carried on his inventive efforts at his own residence rather than at Garlock Equipment and all the tools necessary for product design were supplied by petitioner. Accordingly, we believe that the lack of control by Garlock Equipment *323 over petitioner respecting his inventions leads to the conclusion that petitioner was a self-employed inventor. Other facts tend to support our conclusion. First, in addition to the use of products developed by its owner and president, Russell G. Garlock, Garlock Equipment had, on occasion, sought outside assistance in the area of product design, thus indicating that at times it did gather products for marketing from non-employees. Second, petitioner, in years prior to his association with Garlock Equipment, conducted an independent enterprise for the purpose of developing and marketing inventions. Respondent argues that in the initial employment agreement the parties indicated that petitioner was to put his "full-time for the benefit of Garlock Equipment Company." Initially we note that the label attached to the relationship by the parties is not necessarily determinative. See section 31.3401(c)-1(e), Employment Tax Regs. However, even if such characterization was determinative, our reading of the initial agreement reveals that it is silent on the question of petitioner's status with respect to his inventions. Petitioner was to receive a percentage of the sales price of his *324 inventions and no mention was made as to whether such remuneration was made in petitioner's status as an employee or as a self-employed inventor. Petitioner was free to invent items not relating to the roofing industry and offer them for sale to entities other than Garlock Equipment. Thus, we view the phrase "full-time for the benefit of Garlock Equipment" as ambiguous with respect to petitioner's status. Moreover, an amended agreement between petitioner and Garlock does refer to petitioner as a free lance designer and an even later agreement spells out that petitioner, through his own company, Walser Equipment, was an independent contractor of Garlock Equipment with respect to petitioner's inventions. While we reiterate that none of these agreements are determinative as to petitioner's status, we do believe that the latter agreements obliterate the strength of respondent's argument as allegedly supported by the initial agreement. We therefore conclude that we gain no insight as to petitioner's status from all of the employment agreements. Respondent further states that since Garlock Equipment would not have hired petitioner but for his inventive abilities, it is evident that *325 the scope of petitioner's employment included inventive activities. We conclude that Garlock Equipment was attracted to petitioner because of his inventive abilities but that his position as chief engineer included only the administrative duties enumerated in our findings. Petitioner attended to these duties during the entirety of regular working hours. It is true that petitioner's status as chief engineer was acquired because of his inventive abilities. Yet the position of chief engineer and that of inventor bear no similarity in the instant case. Petitioner quit his association with Aeroil Products and came to Garlock Equipment having already developed the Big Swede. It is clear that Garlock Equipment was interested in marketing the Big Swede. Petitioner was interested in employment as well as additional remuneration for his inventions. Thus, to consummate the transaction between petitioner and Garlock Equipment petitioner was offered the administrative position of chief engineer as well as a royalty on inventions marketed. While our view of petitioner's status might well be different if he spent major portions of each day on the premises of Garlock Equipment working on design *326 for inventions, under the facts presented we believe petitioner's status as an employed chief engineer of Garlock Equipment did not include his work in the area of product design. See Chilton v. Commissioner,40 T.C. 552 (1963), wherein it was concluded that the taxpayer therein was not "hired to invent." Respondent further points out that most of Garlock Equipment's products were designed by an employee, Russell D. Garlock. This factor falls short of shedding any light on petitioner's status as Russell D. Garlock was the company's owner. Thus, we hesitate to discern any company policy to use only products developed by employees when an overwhelming majority of products were developed by an owner-employee. Moreover, Garlock Equipment, on occasion, sought outside assistance in the area of product design. The fact that for the years in issue petitioner's income derived from inventions came solely from Garlock Equipment is highlighted by respondent as evidence of petitioner's employee status. Respondent points to Vesey v. Commissioner,T.C. Memo. 1974-163 and Cowing v. Commissioner,T.C. Memo. 1969-135 as authority for his position. *327 In Vessy the taxpayer was an ophthalmologist who worked for the Veterans Administration (VA) and claimed that moneys derived from his work at the VA were self-employment income. In holding that the taxpayer was an employee, we noted the taxpayer's regular hours at the VA and that the doctor was a re-employed annuitant of the VA. We concluded that being so classified was a strong indicium of an employer-employee relationship. In Cowing we held that the taxpayer-radiologist was a hospital employee. We noted among other factors that the hospital provided the taxpayer with space and equipment and that petitioner worked regular daily hours. While we cited the taxpayer's lack of other remunerative work it was but one factor in our factual analysis. Moreover, in the instant case petitioner, in the years in issue, did develop inventions not related to the roofing industry although with little marketing success. Furthermore, we find both Cowing and Vesey to be distinguishable from the instant case in that in the former cases the taxpayer's work for the employer was single faceted, i.e., the duties of a specialized physician, whereas in the case at bar petitioner's work *328 for Garlock Equipment was two-edged, i.e., he was both a chief engineer and an inventor. Having decided that petitioner was a self-employed inventor during the years in issue, it follows that contributions made to petitioner's retirement plan are deductible. Additionally, the interest income earned by the retirement trust for the years in issue is rendered nontaxable by virtue of sections 501(a) and 402(a)(1). Decision will be entered for petitioners.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue.↩