T.C. Memo. 2007-66

UNITED STATES TAX COURT

PENO TRUCKING, INCORPORATED, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 21070-03.                    Filed March 21, 2007.

<u>Brent L. English</u>, for petitioner.

<u>Linda C. Grobe</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HAINES, <u>Judge</u>:  The petition in this case was filed in response to a Notice of Determination Concerning Worker Classification Under Section 7436 regarding petitioner's liabilities pursuant to the Federal Insurance Contributions Act (FICA) and the Federal Unemployment Tax Act (FUTA) for 1997,

1998, and 1999 and each of the quarters therein (periods at issue).[1]

The issues for decision are:  (1) Whether certain drivers who operated petitioner's trucks were employees of petitioner for Federal employment tax purposes during the periods at issue and, if so, (2) whether petitioner is entitled to relief under section 530 of the Revenue Act of 1978, Pub. L. 95-600, 92 Stat. 2885, as amended (act section 530).[2]

FINDINGS OF FACT

The parties' stipulation of facts and the attached exhibits are incorporated herein by this reference, and the facts stipulated are so found.  At the time the petition was filed, petitioner's principal place of business was in Warren, Ohio.

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended, and Rule references are to the Tax Court Rules of Practice and Procedure.  Amounts are rounded to the nearest dollar.

[2] This Court ordered the parties to file posttrial briefs. Respondent did so; petitioner did not.  Under these circumstances, the Court may hold petitioner in default on all issues for which it bears the burden of proof.  See Stringer v. Commissioner, 84 T.C. 693, 704-708 (1985), affd. without published opinion 789 F.2d 917 (4th Cir. 1986); Furniss v. Commissioner, T.C. Memo. 2001-137; McGee v. Commissioner, T.C. Memo. 2000-308.  However, we will decide this case on the record as it stands.  We base our understanding of petitioner's position on its petition, the stipulation of facts, and trial testimony.

Petitioner was an S corporation incorporated in the State of Ohio on December 23, 1993.[3]

A.   Petitioner's Business Operation

Petitioner was engaged in the business of operating a trucking company to transport steel and other freight.  Robert Peno, Sr., and Joann Peno, husband and wife, were petitioner's sole shareholders and sole officers.  Joann Peno was president, and Robert Peno, Sr., was vice president.

During the periods at issue, petitioner owned approximately 15 tractor-trailers (trucks), which it leased to the Ohio Transport Corp.[4] (Ohio Transport) pursuant to written lease agreements (leases).  The leases required petitioner to transport freight and perform related services for Ohio Transport within a reasonable time in a safe, competent, lawful, and workmanlike manner, inform Ohio Transport daily as to the vehicles' locations and the shipments being transported, and pay all costs of operating the leased trucks and related equipment.

Under the leases, petitioner was required to provide drivers to operate its trucks and be responsible for all work performed by the drivers and to confirm their work was performed in

---

[3] Although petitioner went out of business in 2003, it was still an Ohio corporation in good standing when this petition was filed.

[4]  Ohio Transport is an interstate motor carrier headquartered in Ohio.

accordance with the leases.  Consequently, petitioner was required to direct, supervise, pay, discipline, and discharge its drivers.[5]  Petitioner was also responsible for determining the days and hours per day the drivers worked, the routes traveled,[6] and the order of picking up and delivery of shipments and ensuring that the drivers had the appropriate commercial drivers' licenses.[7]

The leases also required petitioner to submit completed drivers' logs to Ohio Transport and to "cooperate in the preparation, carrying and preservation of manifestos, bills of lading, way bills, freight bills, and other papers and records respecting the lading and the use of equipment, all in accordance with applicable laws and regulations".

---

[5] The leases required petitioner, not Ohio Transport, to withhold and pay employment taxes for its drivers and pay the premiums for workers' compensation or employers' liability insurance to cover the drivers.

[6] However, the parties stipulated that the drivers determined the routes to travel, not petitioner.

[7] Petitioner was required to confirm that the drivers complied with all applicable laws, government rules, regulations, and orders.  Ohio Transport and its insurer also determined whether the drivers had the appropriate credentials and driving records to operate the leased equipment.

As compensation, petitioner received 75 percent of the total amount paid to Ohio Transport by its customers for each load hauled by a leased truck.[8]

The leases required Ohio Transport to provide liability insurance for petitioner's trucks while they were "under dispatch".[9]  Otherwise petitioner provided the insurance.  If a driver intentionally damaged a truck or its cargo, he or she was responsible for the damage, to the extent it was not insured.

B.  Relationship Between Petitioner and Drivers

Petitioner entered into an agreement (agreement) with each of its drivers during the periods at issue which expressly provided that the drivers were independent contractors and not employees.  The agreement, in pertinent part, stated:

---

[8] During the periods at issue, petitioner and Ohio Trucking also had an oral agency agreement by which petitioner was paid a 9-percent agency fee on all loads it solicited from customers on behalf of Ohio Transport.  The 9-percent fee was over and above the 75 percent Ohio Transport paid petitioner for each load hauled under the leases.  The drivers were paid no portion of the separate 9-percent agency fee.

These loads were hauled by petitioner's trucks or by individuals who owned their own trucks (owner-operators).  A number of owner-operators hauled steel for Ohio Transport and were dispatched by petitioner.  The owner-operators' employment relationship with petitioner is not at issue in this case.

[9] The term "under dispatch" means Ohio Transport had contacted petitioner to haul a particular load, petitioner agreed to haul the load, and the truck used to haul the load was:  (1) En route to pick up the load; (2) was picking up the load; (3) was transporting the load; or (4) was returning to the location where the truck was garaged having delivered the load.

Peno Trucking Inc. and Operator agree and understand that Operator is not an employee or agent of Peno Trucking Inc. Operator is an independent contractor and Peno Trucking Inc. shall not direct in any manner the means or method by which Operator shall perform his occupation. Operator understands that Peno Trucking Inc. from time to time contracts with other persons or corporations, to transport goods via Peno Trucking Inc. trucks and equipment. While not an employee of such other persons or corporations, Operator shall, at all times applicable hereto, work at the direction and control of such persons or corporations.

Peno Trucking Inc. agrees to pay Operator at the percentage of * * * per total gross pay per load. Additionally, Peno Trucking Inc. shall be responsible for all maintenance of Peno Trucking Inc. equipment, all fuel, oil, tolls, permits, and road fuel taxes incurred by Operator on such dispatched trips in Peno Trucking Inc. equipment.

Operator agrees and understands that he is solely responsible for payment of all income and withholding taxes, Social Security and unemployment compensation. In accordance with the terms of this agreement, Peno Trucking Inc. will supply Operator with an IRS Form 1099 at the end of each calendar year.

Operator understands and agrees that he cannot obligate, contract or incur any indebtedness on behalf of Peno Trucking Inc.

Petitioner's drivers were not obligated to accept petitioner's request to transport a load, to work on any particular day, or work any particular schedule. If a driver chose not to haul a load or work for a period of time, he or she was not disciplined or sanctioned. Petitioner and the drivers were entitled to terminate their relationship at any time.

Petitioner provided all necessary equipment required to secure the cargo hauled on its trucks. However, petitioner's

drivers were free to supply any additional equipment at their own cost.  Drivers paid for their own gloves, hand tools, and meals. If a driver's relationship with petitioner was severed, the driver was free to take any equipment or accessories he or she had provided.

Petitioner paid for all fuel, oil, highway use taxes, and normal maintenance and repairs required to operate its trucks. Petitioner was solely responsible for determining the nature and timing of any repairs and/or maintenance of its trucks, and its mechanics performed all the maintenance and repairs.[10]  The drivers were not required to make any repairs or perform any maintenance to the trucks, but they were obligated to comply with the Federal motor carrier safety regulations, including those provisions which required pretrip inspections.

Drivers were paid, on a weekly basis, between 23 percent and 27 percent of the 75 percent petitioner received for each hauled load.  The more loads a driver hauled each week, the more money he or she earned.[11]

_____

[10] However, if a truck broke down in an area where it was not feasible for petitioner to send one of its mechanics to make repairs, or if the repairs needed were extensive, petitioner hired a third party to make the repairs.

[11] However, drivers were limited by the Federal motor carrier safety regulations as to the amount of time they could drive each day.

During the periods at issue, petitioner filed Forms 1099-MISC, Miscellaneous Income, for each of its drivers who worked under the agreement.

In 1997, 1998, and 1999, respondent reclassified as employees a total of 29, 24, and 21 drivers, respectively. Of the drivers who were reclassified, 13 had contracted with petitioner for more than 2 years and 4 had contracted with petitioner for more than 3 years.

C.  Day-to-Day Operations

When Ohio Transport had freight which needed to be transported, ordinarily in the Midwest and frequently to States adjoining Ohio, it or a mill[12] working with Ohio Transport would contact petitioner and instruct it as to the specifications of the particular job. If petitioner had a truck available to haul the load, it would offer the job to one of its drivers. If a driver was unavailable or unwilling to accept the load, then the load was offered to another driver.[13]

If a driver accepted the job, petitioner advised the driver, in accordance with Ohio Transport's or the mill's directives, of the time to pick up the load, the delivery location, and the

---

[12] A mill was the facility where petitioner's drivers would travel to pick up a load of steel or other materials.

[13] Petitioner also had the option of offering the load to one, or more, of the owner-operators who had leased their trucks to Ohio Transport.

expected delivery time.[14]  The drivers carried beepers so that petitioner could remain in contact while they were on the road. Petitioner did not direct the routes drivers were to use in either picking up or delivering loads.[15]  If a driver chose to drive on a toll road, the driver was responsible for paying the tolls.[16]  After a load was delivered, the driver could immediately return to petitioner's place of business with or without a return load.[17]

D.    Ohio Determination of Independent Contractor Status

On May 18, 1995, Richard Chatfield (Chatfield), one of petitioner's drivers, filed a claim with the Ohio Industrial Commission (OIC) for workers' compensation because of an injury he suffered on May 2, 1995.  By order dated October 25, 1995, the Ohio Industrial Commission (OIC) disallowed Chatfield's claim, finding he was not an employee of petitioner on the date of injury but an independent contractor who had failed to secure

---

[14] The same information was provided to any owner-operator who was offered, and accepted, an assignment to pick up and transport a load.

[15] However, the driver's route was specified when Ohio Transport obtained a special hauling permit to carry a load that exceeded weight and/or width limitations.

[16] Although the agreement stated petitioner would cover the cost of toll roads, the parties stipulated that the drivers were actually required to cover the costs of paying tolls.

[17]  Ordinarily, it was in petitioner's and the driver's best interests for the driver to request petitioner to find a return load.

workers' compensation for himself.  The OIC order did not state the basis for its determination.

On December 21, 1995, Chatfield filed an appeal in the Court of Common Pleas, Trumball County, Ohio (court of common pleas). By order dated August 21, 1996, pursuant to the journal entry of the court of common pleas filed on June 18, 1996, the Bureau of Workers' Compensation (BWC) dismissed Chatfield's appeal without prejudice.

On June 26, 1997, another driver for petitioner, Kenneth G. Jamison (Jamison), filed a claim for workers' compensation because of an injury he suffered on June 18, 1997.  Basing its decision upon a signed agreement between petitioner and Jamison dated March 3, 1997, the BWC denied Jamison's claim on August 25, 1997.  Jamison appealed the denial of his claim to the OIC on September 4, 1997.  The OIC vacated the previous BWC order and found without stating the grounds for its decision that Jamison was an independent contractor who had not secured workers' compensation for himself.

On December 16, 1997, Jamison filed an appeal in the court of common pleas.  On June 8, 1998, the court of common pleas entered an order of voluntary dismissal without prejudice.

OPINION

I.   Employees v. Independent Contractors

Petitioner contends that for employment tax purposes during the periods at issue the drivers of its trucks were independent contractors, not employees.

The taxpayer has the burden of proving the existence of an independent contractor relationship.[18]  See Rule 142(a); Ellison v. Commissioner, 55 T.C. 142, 152 (1970).  For the purposes of employment taxes, the term "employee" includes "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee".  Sec. 3121(d)(2); secs. 31.3121(d)-1(c), 31.3306(i)-1, Employment Tax Regs.

Whether an individual is a common law employee is a question of fact, Ellison v. Commissioner, 55 T.C. 142, 152 (1970); sec. 31.3121(d)-1(c)(3), Employment Tax Regs., to be determined applying the following factors:  (1) The degree of control exercised by the principal; (2) which party invests in work facilities used by the individual; (3) the opportunity of the individual to realize profit or loss; (4) whether the principal can discharge the individual; (5) whether the work is part of the

_____

[18] Petitioner did not contend that the burden of proof was placed upon respondent pursuant to act sec. 530(e)(4) as added by the Small Business Job Protection Act of 1996, Pub. L. 104-188, sec. 1122(b)(3), 110 Stat. 1767.

principal's regular business; (6) the permanency of the relationship; and (7) the relationship the parties believed they were creating, Ewens & Miller, Inc. v. Commissioner, 117 T.C. 263, 270 (2001); Weber v. Commissioner, 103 T.C. 378, 387 (1994), affd. 60 F.3d 1104 (4th Cir. 1995); Potter v. Commissioner, T.C. Memo. 1994-356.  No single factor is dispositive.  Ewens & Miller, Inc. v. Commissioner, supra at 270.  If an employer-employee relationship exists, characterization by the parties as some other relationship is immaterial.  Sec. 31.3121(d)-1(a)(3), Employment Tax Regs.

A.    Degree of Control

The "degree of control" test requires the Court to examine not only the control exercised by an alleged employer, but also the degree to which the alleged employer may intervene to impose control.  Weber v. Commissioner, supra at 387-388.

The agreement stated that "Peno Trucking Inc. shall not direct in any manner the means or method by which Operator shall perform his occupation" and "Operators shall, at all times applicable hereto, work at the direction and control of" persons or corporations petitioner contracts with to transport goods. The stipulated facts and testimony clearly show otherwise.

Pursuant to the leases with Ohio Transport, petitioner was responsible for hiring drivers, overseeing all work performed by the drivers, confirming their work was performed in accordance

with the leases, and directing, supervising, paying, disciplining, and discharging the drivers.

Petitioner determined the days drivers could work and controlled which loads the drivers would haul. Petitioner required the drivers to have appropriate commercial drivers' licenses, deliver the freight to certain places at certain times, maintain driving logs and other documents, and carry beepers.[19] Petitioner, not the drivers, determined whether truck repairs were performed on the road or by its own mechanics and was responsible for all truck maintenance costs incurred in maintaining the trucks.

The fact that the drivers could choose the routes to take to the specified destination, were liable to pay tolls, and could stop and rest when desired does not mean petitioner did not maintain the requisite control. For an employer-employee relationship to exist, petitioner is not required to direct or control the manner in which the services are performed, so long as it has that right to do so if necessary. Sec. 31.3121(d)-1(c)(2), Employment Tax Regs.

It was unnecessary for petitioner to control the manner in which the drivers completed their work because their work

---

[19] At trial, Mr. Peno testified that petitioner did not require its drivers to carry electronic communication devices. However, a stipulated exhibit indicated petitioner required its drivers to carry beepers, presumably so that it could maintain contact while the drivers were on the road.

required little supervision.  See <u>Day v. Commissioner</u>, T.C. Memo.
2000-375.  This factor indicates petitioner exercised control
over the drivers' activities consistent with an employer-employee
relationship.  See <u>id.</u>

    B.    <u>Investment in Facilities</u>

The fact that a worker provides his or her own tools
generally indicates a nonemployee status.  <u>Ewens & Miller, Inc.
v. Commissioner</u>, <u>supra</u> at 271.

The drivers incurred some cost for tools and maintaining
their licenses.[20]  However, these costs were insignificant when
compared to petitioner's substantial investment to acquire and
maintain the fleet of approximately 15 trucks.  The drivers did
not pay any of the costs of operating the trucks or transporting
the freight.  The agreement stated petitioner alone was
responsible for all maintenance of its equipment, all fuel, oil,
tolls,[21] permits, and road fuel taxes incurred by the drivers on
dispatched trips while in petitioner's trucks.

The relatively minor investment by the drivers and the
substantial investment by petitioner support an employer-employee
relationship.

---

[20] The drivers provided their own hand tools and, at their
option, could provide ratchet binders to use rather than the snap
binders that were provided with the trucks.

[21] Although the agreement stated petitioner would cover
those costs, the parties stipulated that the drivers were
actually required to cover the costs of paying tolls.

C.    Opportunity for Profit or Loss

A worker's opportunity to earn a profit and assume risk of loss may indicate a nonemployee status.  Simpson v. Commissioner, 64 T.C. 974, 988 (1975).  On the other hand, earning an hourly wage or salary indicates an employer-employee relationship exists.  Del Monico v. Commissioner, T.C. Memo. 2004-92; Kumpel v. Commissioner, T.C. Memo. 2003-265.

The drivers were not paid an hourly wage or salary.  They were paid 23 to 27 percent of the 75 percent petitioner received per load hauled, and the amounts earned depended entirely upon the number of trips they made.  The drivers did not assume any risk of loss.  As stated in the agreement, a driver could not incur any indebtedness on behalf of petitioner.  This factor indicates an employer-employee relationship.

D.    Right To Discharge

Generally, an employers' right to discharge an employee indicates an employer-employee relationship.  Sec. 31.3121(d)-1(c)(2), Employment Tax Regs.  The parties stipulated that petitioner retained the right to discharge its drivers and the drivers had a right to terminate their relationship with petitioner.  However, at trial Mr. Peno testified that he personally would not terminate a driver; instead Ohio Transport or the mills would ban the driver.  Mr. Peno's testimony as to

this factor was self-serving and unreliable. This factor indicates an employee-employer relationship.

E.    Integral Part of Business

The drivers performed a service essential to petitioner's operation. The success of petitioner's business depended, in large part, upon the service performed by the drivers. Thus, the drivers were an integral part of petitioner's business. This factor supports an employer-employee relationship. See Day v. Commissioner, supra.

F.    Permanency of the Relationship

A transitory work relationship may point toward a nonemployee status. Ewens & Miller, Inc. v. Commissioner, 117 T.C. at 273. If, however, a person works in the course of the employers' trade or business, the fact that he does not work regularly may be insignificant. Id.

The drivers worked in the course of petitioner's business rather than having a transitory relationship with petitioner. This factor supports an employer-employee relationship. See id.

G.    Relationship the Parties Thought They Created

Petitioner and its drivers entered into written agreements which expressly provided that the drivers were independent contractors. However, our findings with respect to the degree of control exercised by petitioner, petitioner's investment in the trucks, the drivers' lack of assumption of risk, the ability to

discharge, the integration of the drivers into the business, and the permanency of the relationship override any contrary characterization contained in the agreement.  See sec. 31.3121(d)-1(a)(3), Employment Tax Regs.  Accordingly the Court finds petitioner's drivers were common law employees during the periods at issue and, consequently, the payments to them during these periods constituted wages subject to Federal employment tax.

II.  <u>Whether Petitioner Is Eligible for Act Section 530 Relief</u>

Petitioner contends it is entitled to relief pursuant to act section 530.  Congress enacted act section 530 to alleviate what it perceived as the "'overly zealous pursuit and assessment of taxes and penalties against employers who had, in good faith, misclassified their employees as independent contractors.'" <u>Ewens & Miller, Inc. v. Commissioner</u>, <u>supra</u> at 276-277 (quoting <u>Boles Trucking, Inc. v. United States</u>, 77 F.3d 236, 239 (8th Cir. 1996)).  Act section 530(a)(1) shields a taxpayer who has mistakenly not classified his workers as employees from employment tax liability if the taxpayer had a reasonable basis for not treating the workers as employees and has filed all required Federal employment tax returns on a basis consistent with this treatment.  Petitioner never treated the drivers as employees and consistently issued them Forms 1099-MISC.  The

question which remains is whether petitioner had a reasonable basis for treating the drivers as nonemployees.

A taxpayer is treated as having a reasonable basis for not treating an individual as an employee if the taxpayer reasonably relied on any of the following:

> (A) judicial precedent, published rulings, technical advice with respect to the taxpayer, or a letter ruling to the taxpayer;

> (B) a past Internal Revenue Service audit of the taxpayer in which there was no assessment attributable to the treatment (for employment tax purposes) of the individuals holding positions substantially similar to the position held by this individual; or

> (C) long standing recognized practice of a significant segment of the industry in which such individual was engaged.

Sec. 530(a)(2).[22]

Petitioner's sole contention is that it relied upon judicial precedent in determining its drivers were independent contractors, basing its decision on the court of common pleas' rulings and the administrative and appeals decisions finding that two of petitioner's drivers were independent contractors.

---

[22] A taxpayer who fails to come within any of the safe harbors is still entitled to relief if the taxpayer can demonstrate, in some other manner, a reasonable basis for not treating the individual as an employee. Veterinary Surgical Consultants, P.C. v. Commissioner, 117 T.C. 141, 147 (2001), affd. sub nom. Yeagle Drywall Co. v. Commissioner, 54 Fed. Appx. 100 (3d Cir. 2002).

For a taxpayer to have a reasonable basis for not treating an individual as an employee under the judicial precedent safe harbor, the judicial precedent relied upon must have evaluated the employment relationship through a Federal common law analysis. See sec. 3121(d); Nu-Look Design, Inc. v. Commissioner, T.C. Memo. 2003-52, affd. 356 F.3d 290 (3d Cir. 2004); secs. 31.3121(d)-1(c), 31.3306(i)-1, Employment Tax Regs. To come within the safe harbor, "the taxpayer must have relied on the alleged authority during the periods in issue, at the time the employment decisions were being made. The statute does not countenance ex post facto justification." Nu-Look Design, Inc. v. Commissioner, supra.

The record does not indicate that the BWC, the OIC, or the court of common pleas evaluated the employment relationships of petitioner's former drivers, Chatfield and Jamison, through a common law analysis. Only the BWC's vacated order in the Jamison case indicated the grounds for its decision: "The signed agreement by and between Peno Trucking Inc. and the Injured Worker dated 3/3/97." Moreover, nothing in the record indicates the rulings concerning Jamison and Chatfield were relied upon at the time petitioner's employment decisions were made. Petitioner failed to establish that it relied upon judicial precedent or otherwise provided a reasonable basis to disregard section 3121(d)(2) and sections 31.3121(d)-1(c) and 31.3306(i)-1,

Employment Tax Regs.  Therefore this Court finds petitioner is not entitled to act section 530 relief for its drivers.

The Court, in reaching its holding, has considered all arguments made and concludes that any arguments not mentioned above are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered for respondent</u>.